# Exhibit A

DocuSign Envelope ID: 3A298636-5B11-450D-820E-125D7E60D0EC



# SALES FINISHING REPRESENTATIVE AGREEMENT
## (Tier II SFR)

THIS SALES FINISHING REPRESENTATIVE AGREEMENT ("Agreement") is dated as of ___5/3/2022 | 6:24 PM MDT___, 20__ (the "Effective Date") and is between ALDER HOLDINGS, LLC, a Utah limited liability company with its principal offices located at 450 North 1500 West, Orem, UT 84057 ("Alder") and [_____Raydell Mason_____], an individual with a current street address of [Raydell Maskn_____], and an email address of [_____Raydellm27@gmail.com_____] ("Representative").

## RECITALS

A.  Alder is in the business of marketing, selling, installing, and monitoring home security, automation systems, and other systems and generally engaging in other related business activities (collectively, the "Business").

B.  Alder desires to retain Representative, and Representative desires to provide services to Alder, on the terms and conditions set forth herein.

## AGREEMENT

NOW, THEREFORE, in consideration of the foregoing and the mutual covenants set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

1.  Definitions.  As used in this Agreement, the following capitalized terms have the meanings set forth below:

"Alder" has the meaning set forth in the introductory paragraph.

"Alder Policies" means any policy, practice, procedure or directive of Alder, including, without limitation, the Code of Conduct, Sales Finishing Representative Handbook, Sales Finishing Representative Rules (SFR Rules), Sales Training Manual, A/V Recording Policy, payment practices and housing policies, as each may be established, amended, revised or otherwise modified from time to time by Alder in its sole discretion with one (1) business days' notice to Representative. The Alder Policies are located on Genesis.

"Approved Absence" means, with respect to Representative, an approved or authorized leave of absence from performing the Services, including: (i) except as otherwise permitted pursuant to item (ii) below, military leave approved in advance by Alder in its sole and absolute discretion, (iii) leave approved in advance in writing by Alder in its sole and absolute discretion, including for the purpose of Representative to pursue full-time enrollment as a student at a college or university; and (iv) to the extent applicable to Representative, leave permitted pursuant to the Uniformed Services Employment and Reemployment Rights Act of 1994, the Family and Medical Leave Act, or any other federal or state law to the extent that such rights for leave cannot be waived by agreement.

"Area" has the meaning set forth in Section 2.

"Automation Bonus" has the meaning set forth in Section 6(e).

"A/V Recording Policy" has the meaning set forth in Section 21.

"Business" has the meaning set forth in Recital A.

"Cause" means a finding by Alder, in its sole discretion, that (i) Representative has committed an act of fraud, dishonesty or embezzlement against Alder or any customer or client thereof; (ii) Representative has been convicted (or entered a plea of *nolo contendre* in lieu thereof) of a felony or of a crime involving fraud, dishonesty, moral turpitude or physical harm to any person; (iii) Representative has breached one or more material terms of this Agreement; (iv) Representative has failed or is unable to obtain any necessary license or permit; (v) Representative fails to begin working for Alder full-time on or before the date designated by Alder; (vi) Representative fails to respond to any communication from Alder for fourteen (14) or more consecutive calendar days during any period of the Term of this Agreement that Representative is under an obligation to be performing Installs for Alder, without the prior authorization of Alder and excluding Approved Absences; (vii) Representative has engaged in conduct that reflects unfavorably upon Representative, Representative's co-workers or Alder; (viii) Representative has refused to implement or follow a lawful rule, regulation or Alder Policies; (ix) Representative has used drugs or alcohol in violation of Alder Policies or that impedes Representative's performance;  (x) Representative fails to perform Representative's duties in a competent manner or to Alder's reasonable satisfaction; (xi) Representative causes injury to Alder's reputation or Business; or (xii) except for Approved Absences, Representative fails to be actively engaged in providing the Services.

"Code of Conduct" means, as of the date of determination, Alder's then-current Code of Conduct as set

A018

forth in Genesis. To be clear, Alder may periodically update and modify the Code of Conduct in its sole and absolute discretion upon one (1) business days' notice to Representative.

"compensation" means any amount due to Representative under the terms of this Agreement or the SFR Rules.

"Compensation Table" means the table or tables that detail the various types of compensation as set forth in the SFR Rules (as amended, restated or otherwise modified from time to time by Alder) corresponding to the Agreement and as assigned to Representative by the Company.

"Completion Bonus" has the meaning set forth in Section 6(c).

"Confidential Information" has the meaning set forth in Section 20(a).

"Contract" means an agreement between Alder or any of its affiliates and a customer pursuant to which Alder or any of its affiliates agrees to provide certain security equipment and related services to the customer.

"Contract Sale" means the direct or indirect sale, exchange or transfer of a Contract by Alder or any of its affiliates to a third party (and does not include transfers to Alder or any of its affiliates) as determined by Alder.

"Contract Install" means, as of the completion of the Install including post-Install survey and submission of applicable documents to Alder, an Install that satisfies all of the following requirements: (i) the Install was done in accordance with Alder Policies; (ii) all installed equipment has been tested; (iii) when applicable, signals have been received by the monitoring company and trouble signals are not being received from the alarm panel; (iv) the customer passed the post-Install survey call including being satisfied with the Install and: (v) all Contract and Install paperwork is complete, correct, and received and confirmed by Alder's corporate office.

"Deliverables" has the meaning set forth in Section 19(a).

"Effective Date" has the meaning set forth in the introductory paragraph.

"Efficiency Percentage" means, for the period of determination, the percentage as calculated as (1) the sum of the Efficiency Points actually earned by Representative during such period, divided by (2) the total possible number of Efficiency Points available for such period.

"Efficiency Points" means, for purposes of computing Representative's Efficiency Percentage, a point award available to Representative on a weekly basis that may be earned by Representative for submitting an inventory report of Representative's current assigned inventory, on time, and as set forth in the SFR Rules. A total of one (1) Efficiency Point is available to be earned by Representative each week.

"Flat Rate Compensation" has the meaning set forth in Section 20(g).

"Genesis" means Alder's sales finishing representative portal (however named), where Representative and other Alder sales finishing representatives have electronic access to the then current Alder Policies.

"Good Standing" means, with respect to a Contract, as of the date of determination, that the Contract satisfies the following requirements: (i) all installation fees and monthly service fees and/or monitoring fees (other than fees outstanding for less than thirty (30) days) have been received or otherwise collected in full by Alder or its nominee; (ii) the customer is currently satisfied with the installation, security equipment (when applicable), monitoring services (when applicable), and all other services provided by Alder and/or the third-party monitoring company (when applicable); and (iii) the Contract has not been cancelled or otherwise terminated and the customer has not requested to cancel or otherwise termination the Contract.

"Government Agencies" has the meaning set forth in Section 20(g).

"Inspection" means an inspection of an Install conducted by an inspector appointed by Alder, in its sole and absolute discretion, to confirm that the Install was performed in accordance with applicable Alder Policies. To be clear, all determinations and disputes with respect to an Inspection, including whether or not the inspected Install was performed in accordance with applicable Alder Policies shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

"Intellectual Property Rights" has the meaning set forth in Section 19(a).

"Install" means an installation of a security system or other systems by Representative pursuant to this Agreement.

"Inventory" means any security, automation, or other equipment provided by Alder that is assigned to Representative.

"Lost Inventory" has the meaning set forth in Section 8.

"Moral Rights" has the meaning set forth in Section 19(b).

"Noncompetition Period" has the meaning set forth in Section 22(a).

"Nonsolicitation Period" has the meaning set forth in Section 22(b).

"Patent Act" has the meaning set forth in Section 19(c).

"Personal Sales Bonus" has the meaning set forth in Section 6(f).

"Qualified Contract" means, as of the date of determination, a Contract that satisfies all of the following requirements: (i) the Contract was personally generated by Representative during the Term; (ii) the Contract has been properly documented and timely submitted to Alder in accordance with Alder Policies; (iii) the Contract has not been cancelled or otherwise terminated and the customer has not requested to cancel or otherwise terminate the Contract; (iv) all mandatory and non-waivable activation fees have been collected upfront and in full in accordance with Alder Policies; (v) all equipment provided for in the Contract has been installed in accordance with Alder Policies; (vi) the Contract was for an initial term of not less than forty-two (42) months; (vii) the customer successfully completed the survey calls in accordance with Alder Policies; (viii) the customer has a credit score equal to or greater than a Class D; (ix) the Contract provides for a permitted billing/payment option in accordance with Alder Policies; and (x) the Contract MMR is no less than the applicable Minimum MMR (as set forth in the Sales Rules). For the avoidance of doubt, the following Contracts will not be deemed Qualified Contracts: (A) Contracts that are submitted to Alder more than five (5) days after the customer has signed the Contract; (B) Contracts where the customer is a renter; (C) Contracts where the owner of the physical building is a government agency; and (D) Contracts where the address is an apartment, duplex or other multi-family type dwelling. To be clear, all determinations and disputes as to whether a Contract is a Qualified Contract shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

"Quality Bonus" has the meaning set forth in Section 6(c).

"Representative" has the meaning set forth in the introductory paragraph.

"Rent Reimbursement Bonus" has the meaning set forth in Section 6(h).

"Returning Bonus" has the meaning set forth in Section 6(g).

"Returning Bonus Payment Date" has the meaning set forth in Section 6(g)(iii).

"Sales Year" means each sales year of Alder during the Term, the first of which shall commence on the Effective Date and run through Saturday of the last week of October following the Effective Date, and then from Monday of the first week of November through Saturday of the last week of October of each subsequent year thereafter, but for the last Sales Year, which shall be from Monday of the first week of November through the date that this Agreement terminates or expires.

"Services" has the meaning set forth in Section 2.

"SFR Rules" means, as of the date of determination, Alder's then-current Sales Finishing Representative Rules. The SFR Rules set forth items such as, but not limited to, compensation and bonuses, additions and reductions to compensation that Representative may receive and certain fees that may be charged to Representative prior to any compensation being paid to Representative.

"SFR-At-Fault" means a service call back appointment created within 90 days of the date of an Install that is attributed to the fault of and subsequently not resolved by the sales finishing representative that personally performed the Install. To be clear, all determinations and disputes as to whether or not a service call back was the fault of the installing sales finishing representative shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

"SFR-At-Fault Percentage" means, with regards to the Installs personally performed by a sales finishing representative during the Term, the percentage as calculated as (1) the total number of SFR-At-Faults, divided by (2) the total number of Installs performed by such sales finishing representative. To be clear, all determinations and disputes as to whether or not a service call back was the fault of the installing sales finishing representative shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

"Term" has the meaning set forth in Section 5.

"Travel Advance" has the meaning set forth in Section 6(j)(iii).

DocuSign Envelope ID: 3A298636-F844-450B-920F-135D7F60D0FC

2. <u>Position and Services</u>. Alder hereby retains Representative as a sales finishing representative of Alder in such geographic area ("<u>Area</u>") as Alder and Representative may determine from time to time during the Term. During the Term, Representative shall assist in finishing the sales process and installing and servicing the residential and commercial security systems, and other systems offered by Alder, and shall perform such duties and responsibilities as are commensurate with and required by such position, and any other services as Alder may assign or delegate to Representative from time to time (collectively, the "<u>Services</u>"). Notwithstanding anything to the contrary, Representative shall not perform any Services for Alder in any area, including the Area, unless and until Representative is (a) authorized by Alder to perform the Services in such area, and (b) has previously obtained any and all permits or licenses required to perform the Services in such area.

3. <u>Direct Seller</u>. Representative acknowledges and agrees that (a) for federal tax purposes Representative is, and shall be classified as, a "statutory nonemployee" and "direct seller" within the meaning of Internal Revenue Code Section 3508(b)(2), (b) as a "statutory nonemployee" and "direct seller", Representative shall be treated as self-employed for all U.S. federal tax purposes (including income, employment and social security taxes), and (c) the terms of this Agreement shall be construed and interpreted in accordance therewith.

4. <u>Relationship of Parties</u>. Representative represents and agrees that Representative is an employee of Alder, but for State and Federal Income Tax purposes, Representative is, and shall be paid as, a "Direct Seller" pursuant to Internal Revenue Code § 3508 and Publication 15-A of the Internal Revenue Service Employee Supplemental Tax Guide and Representative is, therefore, solely responsible for the timely payment of all taxes for any amounts paid to Representative under this Agreement including, but not limited to, all federal, state, or local taxes. Representative further represents and agrees that Alder is under no obligation to withhold any amounts for taxes for Representative nor to inform Representative of any tax obligations, prepare any tax reports, or transfer any amounts for taxes. Alder will provide worker's compensation and general liability insurance coverage for Representative under Alder's insurance; and, where required by state law, withhold employment taxes such as unemployment withholdings. Representative represents and agrees that this Agreement is not, and shall not be construed as, an offer or contract of employment for any period, an offer or guarantee of future employment, or an offer or guarantee of a future contractual relationship.

5. <u>Term</u>. The term (the "<u>Term</u>") of this Agreement shall commence on the Effective Date and continue until the later of (i) Saturday of the last week of October 2022, or (ii) the date on which Representative executes a new sales representative agreement with Alder, <u>unless</u> this Agreement is earlier terminated in accordance with the

following provisions or extended by mutual agreement of the parties:

(a) <u>Termination for Cause</u>. Alder may terminate this Agreement at any time for Cause by delivering notice thereof to Representative specifying that this Agreement is terminated for Cause.

(b) <u>Termination without Cause</u>. Alder may terminate this Agreement at any time and for any or no reason by delivering notice thereof to Representative specifying that this Agreement is terminated without Cause.

(c) <u>Termination by Representative</u>. Representative may terminate this Agreement for any or no reason upon seven (7) days' written notice to Alder.

(d) <u>Effect of Termination</u>.

(i) If this Agreement is terminated by Alder without Cause, then:

(A) Representative shall immediately cease performing any Services hereunder;

(B) Representative shall be entitled to any earned but unpaid compensation, <u>provided</u> that such compensation shall be paid in accordance with Alder's then compensation payment practices;

(C) Notwithstanding anything to the contrary, Alder shall retain any and all rights, title and interest in and to all Contracts and/or Contract Installs personally performed and/or personally generated by Representative, including without limitation Contracts and/or Contract Installs from which Representative has been or was entitled to be paid compensation;

(D) If living in housing accommodations provided by Alder, Representative shall immediately vacate the housing accommodations in broom-clean condition; and

(E) Representative shall immediately repay to Alder the full amount of any and all unearned advances previously paid by Alder to Representative or Alder may offset any such unearned advances by any earned advances that would still be considered earned after termination of Representative.

(ii) If this Agreement is terminated by Alder for Cause or by Representative for any reason, then:

(A) Representative shall immediately cease performing any Services hereunder;

(B) Representative shall be entitled to payment of any earned but unpaid compensation, as of the date of termination, excluding any earned bonus, which Alder may, at its sole discretion, withhold payment thereof, <u>provided that</u> any earned but unpaid compensation shall be paid in accordance with Alder's then-current compensation payment practices;

A021

DocuSign Envelope ID: 3A298636-5D11-450D-820E-125D7E60D0EC

(C) Notwithstanding anything to the contrary, upon termination under this Section 5(d)(ii) Representative shall forfeit all of Representative's rights to any and all forms of compensation relating to Contracts and/or Contract Installs personally performed and/or personally generated by Representative, and Alder shall retain any and all rights, title and interest in and to all such Contracts and/or Contract Installs including, without limitation, Contracts and/or Contract Installs from which Representative has been or was entitled to be paid compensation;

(D) If living in housing accommodations provided by Alder, Representative shall immediately vacate the housing accommodations in broom-clean condition;

(E) If housing accommodations have been provided by Alder to Representative, Representative shall be charged all apartment rental costs from the date of termination through the end of the applicable lease term, notwithstanding Representative shall be obligated to immediately vacate the premises;

(F) Representative shall immediately repay to Alder the full amount of any and all unearned advances previously paid by Alder to Representative, along with any other debt incurred by Representative; and

(G) Alder may deduct from any compensation owed to Representative hereunder any losses, damages, penalties, fines, costs or expenses of whatever kind (including attorneys' fees) that are incurred by Alder as a direct or indirect result of Representative's actions or inactions constituting Cause.

(iii) Sections 4, 5(d), 5(e), 6(l), 8, 12, 13, **Error! Reference source not found.**, 19, 20, 22, 23, 25, 26, and 27 shall survive the termination of this Agreement. Termination of this Agreement by either party shall not act as a waiver of any breach of this Agreement and shall not act as a release of either party from any liability for breach of such party's obligations under this Agreement. Neither party shall be liable to the other for damages of any kind solely as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement by a party shall be without prejudice to any other right or remedy of such party under this Agreement or applicable law.

(e) Return of Materials. Upon any termination of this Agreement or at any time upon Alder's request, Representative shall promptly return to Alder (i) all materials (in written, electronic or other form) containing or constituting Confidential Information of Alder, including without limitation any and all audio recordings of trainings, meetings or other conversations relating to Alder, its affiliates or their respective businesses, and any copies and extracts thereof, in Representative's possession or control, and (ii) all Alder property, including without limitation, cell phones, work uniforms and any other

equipment provided to Representative by Alder, in Representative's possession or control. Representative shall provide Alder with written confirmation of Representative's compliance with Representative's return obligation set forth in this Section 5(e).

6. Compensation. With respect to the subject matter of this Agreement, Representative shall be compensated as set forth in this Section 6 subject to reductions and modifications as set forth herein and in the SFR Rules.

(a) Acknowledgements. Representative hereby acknowledges and agrees that: (i) Representative is not entitled to any compensation other than as expressly set forth herein or otherwise set forth in the SFR Rules; (ii) any compensation advanced to Representative hereunder shall be subject to offsets, adjustments and other charges until completely earned by Representative; (iii) Representative shall not have earned, and will not be entitled to, any Completion Bonus, Automation Bonus, Personal Sales Bonus, Returning Bonus, Rent Reimbursement Bonus, Travel Advance, or Quality Bonus if Representative breaches this Agreement (or any provision that survives its termination) at any time prior to the payment date therefor (*i.e.,* the first Friday of December after the Sales Year just ended as set forth in this Section 6); (iv) Representative shall not have earned, and will not be entitled to, any Returning Bonus for any Contract Installs which underlying Contract is not in Good Standing as reconciled by Alder on or before April 1st of the year following the Sales Year just ended; (v) Representative shall not have earned, and will not be entitled to, any Returning Bonus if Representative breaches this Agreement (or any provision that survives its termination) at any time prior to the Returning Bonus Payment Date; and (vi) while a compensation payment may be advanced and paid pending completion of all necessary prerequisites to earning such compensation (as detailed herein), no compensation shall be finally earned until all such necessary prerequisites have been satisfied in full.

(b) SFR Rules. Representative acknowledges and agrees that Alder maintains certain SFR Rules which are located on Genesis, which (i) Representative is responsible for knowing and understanding, (ii) Alder may modify, change or eliminate from time to time upon one (1) business days' notice to Representative, and (iii) set forth certain fees and deductions applicable to any compensation Representative may receive. The SFR Rules, as adopted, restated, amended or otherwise modified from time to time by Alder, are hereby incorporated herein by this reference. In the event of any inconsistency between this Agreement and the SFR Rules, this Agreement shall govern.

(c) Flat Rate Compensation. Subject to the terms and conditions of this Agreement and the SFR Rules, Representative shall be entitled to receive for each Contract Install personally performed by Representative during the Term the amount as set forth in the Compensation Table

(the "Flat Rate Compensation"). Unless otherwise determined by Alder, in its sole discretion, the amount of Flat Rate Compensation to be paid Representative pursuant to this Section 6(c) shall be paid weekly to Representative in accordance with the then current Alder Policies and pay practices. To be clear, all determinations and disputes as to whether or not Representative personally performed a Contract Install shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(d) Completion Bonus. Subject to the terms and conditions of this Agreement and the SFR Rules, Representative shall be entitled to receive for each Contract Install personally performed by Representative during the Term which underlying Contract that is in Good Standing, as reconciled by Alder on the Saturday of the last week of October of the then current Sales Year, the amount of Completion Bonus set forth corresponding to the number of such Contract Installs in the column entitled "Completion Bonus" (the "Completion Bonus"). To be clear, all determinations and disputes as to the amount of the Completion Bonus, and whether or not such Completion Bonus has been earned, shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(i) Representative shall only be entitled to receive a Completion Bonus if: (A) Representative has not breached this Agreement (or any provision that survives its termination) at any time prior to the payment date for such Completion Bonus (for the avoidance of doubt, any violation of the Code of Conduct which occurs prior to the termination or expiration of this Agreement rather than the date such violation is discovered shall be deemed a breach of this Agreement); (B) neither Alder nor Representative has terminated this Agreement prior to the end of the Sales Year; and (C) Representative has paid to Alder any amounts owed to Alder, including, without limitation, all unearned advances.

(ii) Alder has no obligation to pay the Completion Bonus for any Contract Install if the underlying Contract is not in Good Standing as reconciled by Alder in October of the then current Sales Year.

(iii) The Completion Bonus will be paid, if at all, to Representative on the first Friday of December after the Sales Year just ended.

(iv) **Representative acknowledges and agrees that Representative will not have earned, and will not be entitled to, any Completion Bonus if Representative breaches this Agreement and/or if this Agreement is terminated at any time prior to the payment date for such Completion Bonus.**

(e) Automation Bonus. Subject to the terms and conditions of this Agreement and the SFR Rules, Representative shall be entitled to receive for installing automation equipment in any Install personally performed by Representative during the Term which underlying Contract is in Good Standing, as reconciled by Alder on the Saturday of the last week of October of the then current Sales Year, the amounts corresponding to the type of automation equipment installed as set forth in the Compensation Table (the "Automation Bonus"). To be clear, all determinations and disputes as to the amount of the Automation Bonus, and whether or not such Automation Bonus has been earned, shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(i) Representative shall only be entitled to receive an Automation Bonus if: (A) Representative has not breached this Agreement (or any provision that survives its termination) at any time prior to the payment date for such Automation Bonus (for the avoidance of doubt, any violation of the Code of Conduct which occurs prior to the termination or expiration of this Agreement rather than the date such violation is discovered shall be deemed a breach of this Agreement); (B) neither Alder nor Representative has terminated this Agreement prior to the end of the Sales Year; and (C) Representative has paid to Alder any amounts owed to Alder, including, without limitation, all unearned advances.

(ii) Alder has no obligation to pay the Automation Bonus for any Contract Install if the underlying Contract is not in Good Standing as reconciled by Alder in October of the then current Sales Year.

(iii) Unless otherwise determined by Alder, in its sole discretion, the amount of the Automation Bonus to be paid pursuant this Section 6(e) shall be paid weekly to Representative in accordance with the then current Alder Policies and pay practices, with the remaining portion, if any, to be paid to Representative on the first Friday of December after the Sales Year just ended.

(iv) **Representative acknowledges and agrees that Representative will not have earned, and will not be entitled to, any Automation Bonus if Representative breaches this Agreement and/or if this Agreement is terminated at any time prior to the payment date for such Automation Bonus.**

(f) Personal Sales Bonus. Subject to the terms and conditions of this Agreement and the SFR Rules, Representative shall be entitled to receive for each "Qualified Contract" (as determined in accordance with Alder Policies) personally generated by Representative during the Term which underlying Contract is in Good Standing, as reconciled by Alder in October of the then current Sales Year, the amount set forth in the SFR Rules of two hundred fifty dollars ($250.00), as adjusted in accordance with deductions as outlined in the sales rules applicable to Alder's commission sales representatives (the "Personal Sales Bonus") in effect at the time the Personal Sales Bonus is earned. Only Qualified Contracts in Good

A023

Standing, as reconciled by Alder during such October, will be counted in determining the Personal Sales Bonus. To be clear, all determinations and disputes as to the amount of the Personal Sales Bonus, whether or not a particular Contract constitutes a Qualified Contract, and whether or not such Personal Sales Bonus has been earned with respect to a particular Qualified Contract shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(i)   Representative shall only be entitled to receive a Personal Sales Bonus if: (A) Representative has not breached this Agreement (or any provision that survives its termination) at any time prior to the payment date for such Personal Sales Bonus (for the avoidance of doubt, any violation of the Code of Conduct which occurs prior to the termination or expiration of this Agreement rather than the date such violation is discovered shall be deemed a breach of this Agreement); (B) neither Alder nor Representative has terminated this Agreement prior to the end of the Sales Year (*i.e.,* the Saturday of the last week of October); and (C) Representative has paid to Alder any amounts owed to Alder, including, without limitation, all unearned advances.

(ii)   Alder has no obligation to pay the Personal Sales Bonus for Contract if such Contract is not a Qualified Contract or, if such Contract is a Qualified Contract, and such Contract is not in Good Standing as reconciled by Alder in October of the then current Sales Year.

(iii)   Unless otherwise determined by Alder, in its sole discretion, the amount of the Personal Sales Bonus to be paid pursuant this Section 6(f) shall be paid weekly to Representative in accordance with the then current Alder Policies and pay practices, with no other portion to be paid to Representative.

(iv)   For purposes of determining Personal Sales Bonus, Qualified Contracts must be "personally generated" by Representative.

(v)   **Representative acknowledges and agrees that Representative will not have earned, and will not be entitled to, any Personal Sales Bonus if Representative breaches this Agreement and/or if this Agreement is terminated at any time prior to the payment date for such Personal Sales Bonus.**

(vi)   **Representative acknowledges and agrees that the amount paid as Personal Sales Bonus in respect of a Qualified Contract may be adjusted and reduced based on several factors in accordance with the then sales rules applicable to Alder's commission sales representatives, including, without limitation, billing type, base monitoring rate, credit score and other factors.**

(g)   Returning Bonus.  Subject to the terms and conditions of this Agreement and the SFR Rules,

Representative shall be entitled to receive for each Contract Install personally performed by Representative during the Term, which underlying Contract is in Good Standing, as reconciled by Alder on or before April 1st of the year following the Sales Year just ended, the amount set forth in the SFR Rules (the "Returning Bonus").   To be clear, all determinations and disputes as to the amount of the Returning Bonus, and whether or not such Returning Bonus has been earned, shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(i)   Representative shall only be entitled to receive a Returning Bonus if: (A) Representative has not breached this Agreement (or any provision that survives its termination) at any time prior to the Returning Bonus Payment Date (for the avoidance of doubt, any violation of the Code of Conduct which occurs prior to the termination or expiration of this Agreement rather than the date such violation is discovered shall be deemed a breach of this Agreement); (B) neither Alder nor Representative has terminated this Agreement prior to the end of the Sales Year (*i.e.,* the Saturday of the last week of October); (C) Representative has paid to Alder any amounts owed to Alder, including, without limitation, all unearned advances; and (D) Representative has entered into a Sales Finishing Representative Agreement with Alder for the subsequent Sales Year.

(ii)   Alder has no obligation to pay the Returning Bonus for any Install if such Install is not a Contract Install or, if such Install is a Contract Install, and such underlying Contract is not in Good Standing as reconciled by Alder on or before April 1st of the year following the Sales Year just ended.

(iii)   The Returning Bonus will be paid, if at all, to Representative no later than within the first three (3) weeks after Representative returns and begins performing Installs for Alder following the start of the subsequent Sales Year but not before the Returning Bonus date of reconciliation on or before April 1 of the year following the Sales Year in which the Returning Bonus was earned by Representative. (the date of payment being the "Returning Bonus Payment Date").

(iv)   **Representative acknowledges and agrees that Representative will not have earned, and will not be entitled to, any Returning Bonus if Representative breaches this Agreement and/or if this Agreement is terminated at any time prior to the Returning Bonus Payment Date.**

(h)   Rent Reimbursement Bonus.  Subject to the terms and conditions of this Agreement and the SFR Sales Rules, Representative shall be entitled to earn and receive rent reimbursement bonuses from time to time based on Representative's Efficiencies Percentage in such amounts and at such time as provided in the SFR Rules (the "Rent Reimbursement Bonus").   To be clear, all determinations and disputes as to the amount of a Rent Reimbursement

Bonus, and whether or not a Rent Reimbursement Bonus has been earned shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(i) Representative shall only be entitled to receive a Rent Reimbursement Bonus if: (A) Representative has not breached this Agreement (or any provision that survives its termination) at any time prior to the Rent Reimbursement Bonus Payment Date (for the avoidance of doubt, any violation of the Code of Conduct which occurs prior to the termination or expiration of this Agreement rather than the date such violation is discovered shall be deemed a breach of this Agreement); (B) neither Alder nor Representative has terminated this Agreement prior to the end of the Sales Year (i.e., the Saturday of the last week of October); and (C) Representative has paid to Alder any amounts owed to Alder, including, without limitation, all unearned advances.

(ii) Representative shall only be entitled to receive the Rent Reimbursement Bonus if Representative meets all of the conditions for the Rent Reimbursement Bonus set forth in the then-current SFR Rules.

(iii) The Rent Reimbursement Bonus will be paid, if at all, to Representative on the first Friday of December after the Sales Year just ended.

**(iv) Representative acknowledges and agrees that Representative will not have earned, and will not be entitled to, any Rent Reimbursement Bonus if Representative breaches this Agreement and/or if this Agreement is terminated at any time prior to the payment date for such Rent Reimbursement Bonus.**

(i) <u>Travel Advance</u>. Subject to the terms and conditions of this Agreement, Representative shall be entitled to receive a one-time travel advance each Sales Year of ten cents ($0.10) per mile traveled to the Area, not to exceed a maximum of five hundred dollars ($500), to drive Representative's own vehicle to Representative's assigned Area (the "<u>Travel Advance</u>").

(i) Notwithstanding anything to the contrary herein, if Representative personally performs during the Term at least one hundred twenty-five (125) Qualified Contract Installs, then the Travel Advance shall cease to be an advance and shall be a bonus (i.e., Representative need not repay the Travel Advance and it will not be deducted from Representative's other compensation hereunder).

(ii) If Representative has received a Travel Advance, and except as otherwise provided in <u>Section 6(i)(i)</u>, Representative acknowledges and agrees that (A) Alder may, in its sole discretion, require Representative to return such advance, or (B) Alder may charge back the amount of such Travel Advance and offset such charge back amount against other compensation

otherwise due Representative in accordance with <u>Section 6(l)</u>.

(j) <u>Quality Bonus</u>. Subject to the terms and conditions of this Agreement and the SFR Sales Rules, Representative shall be entitled to receive an amount for each Contract Install personally performed by Representative, during the Term, which underlying Contract is in Good Standing, as reconciled by Alder on Saturday of the last week of October of the year following the Sales Year just ended, the amount set forth in the SFR Rules (the "<u>Quality Bonus</u>"). To be clear, all determinations and disputes as to the amount of a Quality Bonus, and whether or not a Quality Bonus has been earned shall be made and resolved by Alder in its sole and absolute discretion, and, absent bad faith, shall be conclusive and final for all purposes.

(i) Representative shall only be entitled to receive the Quality Bonus if Representative meets all of the conditions for the Quality Bonus set forth in the then-current SFR Rules.

(ii) The Quality Bonus will be paid, if at all, to Representative on the first Friday of December after the Sales Year just ended.

**(iii) Representative acknowledges and agrees that Representative will not have earned, and will not be entitled to, any Quality Bonus if Representative breaches this Agreement and/or if this Agreement is terminated at any time prior to the payment date for such Quality Bonus.**

(k) <u>Deductions from Compensation</u>. Amounts otherwise payable to Representative hereunder shall be subject to the following deductions and/or reductions:

(i) <u>Service Appointment Late or No-Show Penalties</u>. If Representative fails to appear at any appointment to resolve a service appointment, or more than thirty (30) minutes late to a service appointment, then compensation otherwise payable to Representative will be reduced by one hundred dollars ($100) for each such incident. To be clear, Alder may charge back the amount of any Service Representative penalty pursuant to this <u>Section 6(k)(i)</u> and offset such charge back amount against other compensation otherwise due Representative in accordance with <u>Section 6(l)</u>.

(ii) <u>SFR-At-Fault Service Penalty</u>. If Alder is required to compensate another representative to resolve Representative's SFR-At-Fault, then compensation otherwise payable to Representative will be reduced by the amount actually paid to other representative in order to resolve such SFR-At-Fault.

(l) <u>Offset Permitted</u>. Notwithstanding anything to the contrary in this Agreement, and without prejudice to any other right or remedy Alder has or may have, Alder may, without notice to Representative, offset or recoup any liability it owes to Representative, including without

A025

DocuSign Envelope ID: 3A208636-5B14-450B-8205-125D7EC0D0EC

limitation any compensation payable hereunder, against any liability for which Alder determines in good faith Representative is liable to Alder or its affiliates, including without limitation, advances and unearned bonuses, whether either liability is matured or unmatured, is liquidated or unliquidated or arises under this Agreement.

7. Policies and Procedures.

(a) Representative agrees to abide by, and comply with, all Alder Policies, including, without limitation, the Code of Conduct, and the SFR Rules. By executing this Agreement, Representative acknowledges and represents that Representative has received, reviewed and understands, and agrees to abide by, the Alder Policies.

(b) Representative acknowledges and agrees that Alder may, in its sole and absolute discretion, periodically establish, update, amend, revise, replace or otherwise modify any of the Alder Policies, including the Code of Conduct, and the SFR Rules upon one (1) business days' notice to Representative.

(c) Representative acknowledges and agrees that Representative's violation or breach of any of the Alder Policies may result in fines, suspension, loss of compensation and/or termination for Cause.

(d) Representative hereby agrees to perform the Services in an ethical and professional manner, consistent with fair sales practices and in accordance with the Alder Policies and applicable law. Any unethical sales practices, including without limitation, violating any provision of the Code of Conduct, the SFR Rules, or any of the other Alder Policies, or any other conduct that harms the reputation, licensure or good standing of Alder in any way shall constitute a breach of this Agreement and shall be grounds for termination for Cause, together with any other remedy Alder may have in law or equity.

8. Inventory Shrinkage. Representative shall be and is responsible for all of Alder's equipment inventory assigned to Representative. In furtherance thereof, Representative agrees to track and safeguard such inventory. In the event of any inventory shrinkage or any other loss of inventory assigned to Representative, regardless of the reason therefore, including, without limitation, missing or lost inventory, or inconsistent inventory records with those of Alder (collectively, the "Lost Inventory"), then Representative shall promptly, but in any event no later than seven (7) days after demand therefor, reimburse Alder for the loss of such inventory at the rate of thirty-five dollars ($35) for each point attributable to each item of Lost Inventory as set forth in the SFR Rules and any additional losses as determined by Alder in its sole discretion. Representative hereby authorizes Alder to offset any amounts due Alder pursuant to this Section 8 against any compensation or other amounts owed to Representative by Alder.

9. Transportation. Representative shall be responsible for Representative's transportation to and from the Area as well as all transportation within the Area for purposes of performing the Services. If Representative chooses to ride in an Alder vehicle, Representative will be required to pay a fuel expense and authorizes and directs Alder to deduct any and all such fuel expense from any compensation or other amounts due or owing to Representative. Neither Representative nor any non-Alder vehicles operated by Representative shall be eligible for any coverage under Alder's auto insurance policy or any other Alder insurance policy unless, with the express written permission of Alder, Representative operates a vehicle owned and maintained by Alder. Representative shall be responsible for acquiring Representative's own auto insurance coverage prior to operating any vehicle (other than an Alder-owned vehicle) in accordance with applicable state law. Representative must have and always maintain a valid, state-issued driver's license.

10. Uniform and Materials. Alder shall provide a work uniform, which shall include a polo shirt, a picture identification badge and a lanyard. Representative shall be responsible for obtaining and wearing appropriate shorts or pants (not jeans) to complete the uniform. Representative represents and agrees that (a) Representative will not wear any unauthorized apparel while working for Alder under the terms of this Agreement, and (b) Representative will not wear any clothing or identification bearing Alder's mark or logo after the termination or expiration of this Agreement. Representative covenants that (i) Representative will use the uniform in accordance with the terms of this Agreement, (ii) the uniform and the logos and marks on the uniform are the property of Alder and that Representative has no rights to them, (iii) Representative will not abuse the uniform or wear it except while performing Services for Alder under the terms of this Agreement, and (iv) the uniform is issued to Representative solely for use during work related functions and not for personal use. Representative is responsible for the reasonable care and maintenance of the uniform and shall return the uniform to Alder at the end of the Term or such earlier date as Alder may request. Once an Alder work uniform has been issued to Representative, it is Representative's responsibility to purchase additional or replacement uniform apparel. Representative may purchase additional Alder shirts and hats from Alder.

11. Failed Inspections and Premises Damage. Inspections will be conducted routinely in accordance with applicable Alder Policies. If any of Representative's Installs fails an Inspection, then (a) Representative shall not receive any compensation for such Install, (b) Representative shall be fined one hundred dollars ($100) for such failed Inspection, and (c) Representative shall pay any costs and expenses necessary to repair the Install so that it complies with Alder Policies, which amounts shall be deducted from compensation otherwise due to Representative. Representative shall report all damage caused to the premises during an Install to (i) the owner of the premises; (ii) Representative's Lead Sales

A026

DocuSign Envelope ID: 3A208636-5B14-4E0B-9205-425D7EC0D0EC

Finishing Representative (if applicable); and (iii) Alder's Sales Finishing Representative Supervisor. Representative shall be responsible for the costs to repair any damages caused to a premises during an Install up to five hundred dollars ($500) per Install, which will be deducted from any compensation otherwise due to Representative.

12. Tools. Representative will be responsible for providing Representative's own tools and equipment to perform the Services. If Representative purchases tools and equipment from Alder, the cost of such tools and equipment will be deducted from the weekly compensation due Representative until the total amount is paid in full. Alder agrees that any such deductions shall not exceed twenty-five percent (25%) of the amount of the weekly compensation to be paid to Representative at any time during the Term. Upon the termination of the Agreement, Representative agrees to pay Alder any remaining costs for the tools and equipment, or such amounts will be deducted from any compensation otherwise due to Representative with Representative responsible for any resulting deficiency.

13. Warranty of Representative's Services. Representative represents, warrants and covenants that the Services shall be free from material errors or other defects and shall conform to any specifications for such Services, including, without limitation, Alder Policies.

14. Housing.

(a) From time to time during the Term, Alder may, in its sole discretion, make available to Representative housing accommodations in the Area. Such housing accommodations will be subject to the terms and conditions of the then Alder Policies. If Representative accepts such housing accommodations, then Alder shall charge weekly in arrears to Representative, and Representative shall pay to Alder, Alder's posted weekly housing fee (as announced and modified by Alder from time to time in its sole discretion). Alder shall also charge Representative for any other housing costs and expenses in accordance with Alder Policies. In the event Representative fails to pay the weekly housing fee, Alder may charge or offset the cost of such housing accommodations against any compensation owed to Representative hereunder in accordance with Section 6(l). Representative may be personally responsible to obtain all utilities for Representative's housing accommodations. Whether Representative personally or Alder obtains utilities in the provided housing accommodations, Representative is responsible for all utility costs.

(b) Alder shall not be liable for theft, loss or damage, if any, to any of Representative's personal property caused by fire, water, or from any cause whatsoever while residing in housing accommodations provided by Alder.

(c) Representative agrees and acknowledges that Alder is not required to secure nor will it secure rental insurance for any housing accommodations provided by Alder for the benefit of Representative. Representative agrees that it is the responsibility of Representative to secure rental insurance for Representative's housing accommodations and personal property.

(d) Representative agrees to comply with all rules and regulations of the applicable housing unit (e.g., HOA or Apartment Rules and Regulations). In the event Representative's actions result in Representative or Alder being evicted, fined and/or penalized, Representative shall be responsible for all additional housing costs, fines, penalties, moving fees, or other expenses or costs resulting from Representative's actions, including any and all attorneys' fees and costs. If any keys, appliances, furniture, cards, or other housing items are missing, Representative will be responsible for any replacement costs.

(e) Representative authorizes and directs Alder to deduct any and all charges, costs, fines, penalties, fees or expenses referred to or referenced in this Section 14 relating to Representative's participation in Alder's housing program from any compensation or other amounts due or owing to Representative.

15. Background Check. This Agreement is contingent on Alder's receipt, evaluation and approval of a background check on Representative. Accordingly, Representative hereby consents to and authorizes Alder to conduct a background check (including a search of criminal, motor vehicle, credit and other records) on Representative, and Representative shall cooperate in the performance of such background check. Representative hereby acknowledges that by consenting and authorizing Alder to conduct a background check Alder may obtain background reports with respect to Representative any time and from time to time during the Term. Representative's failure to provide consent to or the required information for a background check, or failure to answer any background question fully and truthfully, may result in the termination of this Agreement for Cause. All background check information will be kept confidential. Alder shall comply with all applicable federal, state and local laws regarding background checks. Representative represents that Representative has read and agrees to the terms of the Combined Disclosure Notice and Authorization Regarding Background Consumer Reports set forth on Exhibit A hereto relating to the background check.

16. Drug and Alcohol Policy and Testing.

(a) Policy. Alder is a drug-free workplace and Representative is prohibited from manufacturing, distributing, dispensing, possessing, selling, or using illegal drugs or any other controlled substance not specifically prescribed to Representative, misusing or distributing controlled substances specifically prescribed to Representative, or alcoholic beverages in any housing

A027

accommodations provided to Representative by Alder, at any workplace, or while performing any Services under this Agreement.  Violation of this policy may result in fines, suspension and/or termination for Cause.

(b)  Testing.  Representative represents, agrees and consents to random drug testing of Representative at the sole discretion of Alder in accordance with applicable law.  Testing will be conducted only for illegal drugs, controlled substances and alcohol use.  Representative agrees and understands that as a condition of this Agreement, Representative is required to submit to such a test at the request of Alder, and Representative agrees that Representative's signature on this Agreement shall be Representative's express authorization to any such testing in accordance with applicable law.  Representative agrees and understands that Representative's failure to submit to a drug and/or alcohol test or failure of a test may result in fines, suspension and/or termination for Cause.

17.  Licensing.

(a)  Representative assumes responsibility for ensuring that Representative has all necessary permits and licenses to perform the Services.

(b)  Without limiting the generality of Section 17(a), Representative will (i) timely complete and submit to applicable governmental entities any and all necessary licensing applications, (ii) provide accurate and truthful information on all licensing applications to any governmental entity that requests any information from Representative for purposes of licensing, permits, or other requirements for the performance of the Services hereunder, and (iii) not perform any Service hereunder which requires a license or permit unless and until Representative has obtained any and all permits or licenses required to perform such Service.

(c)  Any failure or inability to obtain necessary licenses or permits may result in fines, suspension and/or termination for Cause.  Furthermore, Alder may deduct from any compensation owed to Representative hereunder any losses, damages, penalties, fines, costs or expenses of whatever kind (including attorneys' fees) that are incurred by Alder as a direct or indirect result of Representative's failure or inability to obtain any necessary license or permit.

18.  No Conflict.  Representative represents that Representative has not entered into, and Representative agrees that Representative will not accept work, enter into any agreement, either written or oral, or accept any obligation that is inconsistent or incompatible with Representative's obligations under this Agreement or the scope of Services to be rendered to Alder, or would limit or impair Representative's obligations hereunder.  Representative has disclosed to Alder any obligations, arrangements, agreements or interests that may constitute or give rise to a conflict on the part of Representative.

19.  Intellectual Property Rights.

(a)  Alder is and shall be the sole and exclusive owner of all right, title, and interest throughout the world in and to all the results and proceeds of the Services performed under this Agreement (collectively, the "Deliverables"), including all patents, copyrights, trademarks, trade secrets, and other intellectual property rights (collectively "Intellectual Property Rights") therein.  Representative hereby acknowledges and agrees that the Deliverables are hereby deemed a "work made for hire" as defined in 17 U.S.C. § 101 for Alder.  If, for any reason, any of the Deliverables do not constitute a "work made for hire", Representative hereby irrevocably assigns to Alder, in each case without additional consideration, all right, title, and interest throughout the world in and to the Deliverables, including all Intellectual Property Rights therein.

(b)  Any assignment of copyrights under this Agreement includes all rights of paternity, integrity, disclosure, and withdrawal and any other rights that may be known as "moral rights" (collectively, "Moral Rights").  Representative hereby irrevocably waives, to the extent permitted by applicable law, any and all claims Representative may now or hereafter have in any jurisdiction to any Moral Rights with respect to the Deliverables.

(c)  Representative shall make full and prompt disclosure to Alder of any inventions or processes, as such terms are defined in 35 U.S.C. § 100 (the "Patent Act"), made or conceived by Representative alone or with others during the Term, related in any way to the Services described herein, whether or not such inventions or processes are patentable or protected as trade secrets and whether or not such inventions or processes are made or conceived during normal working hours or on the premises of Alder.  Representative shall not disclose to any third party the nature or details of any such inventions or processes without the prior written consent of Alder.  Any patent or copyright applications relating to the Services, related to trade secrets of Alder or which relate to tasks assigned to Representative by Alder, that you may file within one year after expiration or termination of this Agreement, shall belong to Alder, and Representative hereby assigns the same to Alder, as having been conceived or reduced to practice during the Term of this Agreement.

(d)  Upon the request of Alder, Representative shall promptly take such further actions, including execution and delivery of all appropriate instruments of conveyance, as may be necessary to assist Alder to prosecute, register, perfect, record, or enforce its rights in any Deliverables.  In the event Alder is unable, after reasonable effort, to obtain Representative's signature on any such documents, Representative hereby irrevocably designates and appoints Alder as Representative's agent and attorney-in-fact, to act for and on Representative's behalf solely to execute and file any such application or

other document and do all other lawfully permitted acts to further the prosecution and issuance of patents, copyrights, or other intellectual property protection related to the Deliverables with the same legal force and effect as if Representative executed them. Representative agrees that this power of attorney is coupled with an interest.

(e)   Representative has no right or license to use, publish, reproduce, prepare derivative works based upon, distribute, perform, or display any Deliverables. Except as otherwise specifically permitted herein, Representative has no right or license to use Alder's trademarks, service marks, trade names, trade names, logos, symbols, or brand names.

20.   <u>Confidentiality</u>.

(a)   "<u>Confidential Information</u>" means all non-public, confidential or proprietary information disclosed before, on or after the Effective Date, by Alder or its affiliates (collectively for purpose of this <u>Section 20</u>, "<u>Alder</u>"), to Representative, whether disclosed orally or disclosed or accessed in written, electronic or other form or media, and whether or not marked, designated or otherwise identified as "confidential", including, without limitation: (i) information concerning Alder and its business, operations, methodologies, finances, plans, suppliers or customers;   (ii) third-party confidential information included with, or incorporated in, any information provided by Alder to Representative; and (iii) other information that would reasonably be considered non-public, confidential or proprietary to Alder, including, without limitation, trade secrets, know-how, prices, customer and supplier lists and data, customer databases, pricing and marketing plans, policies and strategies, details of customer and supplier relationships, operations methods, sales techniques and training, business acquisition plans, the identity of employees and other service providers including sales finishing representatives, sales representatives, sales managers and regionals, new recruitment and personnel acquisition plans, processes, patent and trademark applications, websites, internet addresses, email addresses and domain names, including all software, information and processes necessary to operate Alder's website, audio and video recordings containing any training information or other information described herein, and all other confidential information with respect to the Business.

(b)   Representative acknowledges and agrees that, during Representative's relationship with Alder, Representative has had and will have access to and has learned and will learn Confidential Information, the improper use or disclosure of which could have a material adverse effect upon Alder. Accordingly, Representative hereby agrees that, during the Term and at all times thereafter, Representative will: (i) hold the Confidential Information in strict confidence and will not furnish, make available or disclose it to anyone, except to the extent necessary to carry out Representative's responsibilities as

a Representative hereunder; (ii) use Representative's best efforts to protect and safeguard the confidentiality of all such Confidential Information; and (iii) not use such Confidential Information (for personal use or any third party use) except for Alder's benefit and will not misuse, misappropriate or exploit such Confidential Information in any way.

(c)   The restrictions contained in this <u>Section 20</u> shall not apply to any information that: (i) at the time of disclosure is, or thereafter becomes, generally available to and known by the public other than as a result of, directly or indirectly, any breach of this Agreement, act or omission by Representative; or (ii) is disclosed by Representative pursuant to applicable federal, state or local law, regulation or a valid order issued by a court or governmental agency of competent jurisdiction, <u>provided</u> that prior to making any such disclosure, Representative shall, if legally permissible, provide Alder with: (A) prompt written notice of such requirement so that Alder may seek a protective order or other remedy; and (B) reasonable assistance in opposing such disclosure or seeking a protective order or other limitations on disclosure.

(d)   Representative hereby acknowledges that Representative had no knowledge about Alder's business or Confidential Information, other than information Representative learned from Alder during the course of Representative's relationship with Alder. Furthermore, Representative represents, warrants and covenants that Representative will not disclose to Alder, or use, or induce Alder to use, any proprietary information or trade secrets of others at any time, including but not limited to any proprietary information or trade secrets of any former employer, if any. Representative hereby acknowledges and agrees that any violation of this provision shall be grounds for Representative's immediate termination for Cause and could subject Representative to substantial civil liabilities and criminal penalties. Representative further specifically and expressly acknowledges that no officer, employee or representative of Alder has requested or instructed Representative to disclose or use any such third-party proprietary information or trade secrets.

(e)   Alder hereby retains its entire right, title and interest, including all intellectual property rights, in and to all Confidential Information. Any disclosure of such Confidential Information to Representative shall not be construed as an assignment, grant, option, license or other transfer of any such right, title or interest whatsoever to Representative.

(f)   Representative hereby acknowledges and agrees that, due to the unique nature of the Confidential Information, the unauthorized disclosure or use of the Confidential Information may cause irreparable harm and significant injury to Alder, the extent of which will be difficult to ascertain and for which there may be no adequate remedy at law. Accordingly, Representative agrees that Alder, in addition to any other available

remedies, shall have the right to seek an injunction and other equitable relief enjoining any breach or threatened breach of this <u>Section 19</u> without the necessity of posting any bond or other security. Representative shall promptly notify Alder in writing immediately upon Representative becoming aware of any such breach or threatened breach.

(g) Nothing in this <u>Section 20</u> prohibits or restricts Representative (or Representative's attorney) from filing a charge or complaint with any self-regulatory organization or any federal or state regulatory authority ("<u>Government Agencies</u>"). Representative further understands that this <u>Section 20</u> does not limit Representative's ability to communicate with any Government Agency or otherwise participate in any investigation or proceeding that may be conducted by any Government Agency without notice to Alder. This <u>Section 20</u> does not limit Representative's right to receive a monetary award for information provided to any Government Agency.

(h) Nothing in this <u>Section 20</u> in any way prohibits or is intended to restrict or impede Representative from exercising protected rights to the extent that such rights cannot be waived by agreement, or otherwise disclosing information as permitted by law.

(i) Notwithstanding any other provision of this <u>Section 20</u>: (i) Representative will not be held criminally or civilly liable under any federal or state trade secret law for any disclosure of a trade secret that is made: (A) in confidence to a federal, state, or local government official, either directly or indirectly, or to an attorney and solely for the purpose of reporting or investigating a suspected violation of law; or (B) in a complaint or other document that is filed under seal in a lawsuit or other proceeding; and (ii) if Representative files a lawsuit for retaliation by Alder for reporting a suspected violation of law, Representative may disclose Alder's trade secrets to Representative's attorney and use the trade secret information in the court proceeding if Representative (A) files any document containing the trade secret under seal; and (B) does not disclose the trade secret, except pursuant to court order.

21. <u>A/V Recording Policy</u>. In order to encourage open communication, free exchange of ideas, spontaneous and honest dialogue and an atmosphere of trust, Alder has adopted the following policy concerning the audio and/or video recording of Alder personnel, or its property or facilities (the "<u>A/V Recording Policy</u>"): "It is a violation of Alder's policy to record conversations, phone calls, images or company meetings with any recording device (including but not limited to a cellular telephone, PDA, digital recording device, digital camera, etc.) <u>unless</u> prior written approval is received from Alder's then President or General Counsel." Representative acknowledges that Representative has been read and understands the A/V Recording Policy and agrees to abide by the A/V Recording Policy as it may be amended, revised or otherwise modified from time to time. The failure of

Representative to comply with the A/V Recording Policy may result in disciplinary action, including, without limitation, Representative's suspension or termination for Cause.

22. <u>Noncompetition and Nonsolicitation</u>.

(a) During the Term and for the twelve-month period thereafter (the "<u>Noncompetition Period</u>"), Representative shall not, directly or indirectly (whether as a principal, agent, independent contractor, direct seller, representative, employee, partner, owner, or in any other similar capacity), own, manage, operate, participate in, perform services for, be employed by, or otherwise carry on, a business engaged in providing products and/or services that are substantially similar to or competitive with those offered or provided by Alder or any of its affiliates including, among other things, not engaging in sales services for a Competitive Business anywhere in the United States where Representative performed services on Alder's behalf. Notwithstanding the foregoing, Representative shall not be prohibited from being a passive owner of not more than two percent (2%) of the voting equity of any publicly traded entity, so long as Representative has no active participation in the business of such entity.

(b) During the Term and for the twenty-four-month period thereafter (the "<u>Nonsolicitation Period</u>"), Representative shall not, directly or indirectly, recruit, solicit, induce or influence (or seek to induce or influence) any person who is employed by, hired by, affiliated with, or acts as an independent contractor, direct seller or salesperson for, Alder or any of its affiliates to terminate or alter his/her relationship with Alder or any such affiliate.

(c) During the Nonsolicitation Period, Representative shall not, in any manner, directly or indirectly, divert or attempt to divert from Alder or any of its affiliates, any business of any kind, including without limitation, the solicitation of, calling on, or interference with any of Alder's or its affiliates' current or former (within the last two (2) years) customers, clients, investors, business partners or suppliers.

(d) Representative represents and warrants that one of the fundamental expectations of Representative and Alder with respect to Representative's installation of equipment for Contracts is that the Contracts will be renewed by the customers after expiration of the applicable term of the Contracts, and Representative acknowledges that Contracts are customarily so renewed. Accordingly, in consideration of Alder's payments set forth in this Agreement and in consideration of other good and valuable consideration, Representative agrees that Representative shall not, at any time within ten (10) years from the date a Contract was first acquired by Alder or any of its affiliates, directly or indirectly, in any capacity (including, without limitation, for personal, or on behalf of any other person or entity, or as an employee, officer, director, manager, partner, shareholder, agent, independent contractor, direct

A030

seller or other similar person of another person or entity) contact, solicit, or attempt to contact or solicit or accept unsolicited monitoring or alarm installation fees or business from the customer to whom such Contract related. In furtherance of the foregoing, but without limiting the same, without the prior written consent of Alder, which may be given or withheld in Alder's sole and absolute discretion, Representative agrees not to sell or offer to sell monitoring or other services and related equipment to any customer, other than in connection with Representative's performance of the Services hereunder.

(e) Representative agrees that the amount of damage resulting to Alder from a violation of Section 22(d) is difficult to ascertain and acknowledges that Alder shall be entitled to liquidated damages, for loss of revenue and not as a penalty, from Representative if Representative violates this covenant in the amount of any affected Contract's monthly payment to Alder multiplied by fifty (50). Such damages shall be paid by Representative to Alder within ten (10) days after receipt of written demand from Alder. In addition to such liquidated damages, Alder shall also be entitled to equitable relief, including, but not limited to, an injunction, without the necessity of posting any bond or other security, and such relief shall be cumulative and in addition to any other remedies that Alder may have hereunder and/or at law or in equity. In furtherance thereof, Representative agrees not to assert as a defense in any such equitable proceeding that an adequate remedy at law exists.

(f) Representative acknowledges that the obligations of Representative under this Section 22 (including the scope of prohibited activities and the time duration of the provisions) are reasonable in the context of the nature of Alder's business and the competitive injuries likely to be sustained by Alder if Representative were to violate such obligations, and are no broader than is necessary to protect the legitimate business interests of Alder, including its Confidential Information and goodwill. Representative further acknowledges that Alder would not have retained Representative in the absence of this Section 22 and the other covenants and representations and warranties of Representative made herein, which Representative acknowledges constitutes good, valuable and sufficient consideration. Representative also acknowledges that, in the event Representative's services to Alder are terminated for any reason, Representative will be able to earn a livelihood or practice Representative's chosen profession without violating Representative's obligations under this Section 22 and that Representative's ability to earn a livelihood and practice Representative's chosen profession without violating such obligations is a material condition to Representative's retention and continued retention by Alder.

23. Nondisparagement. Representative agrees that Representative will not at any time (including during or after the Term) make, publish or communicate to any person or entity or in any public forum, whether in writing or orally, any defamatory or disparaging remarks, comments, or statements concerning Alder, its affiliates, their respective businesses, or any of their employees or officers, and existing and prospective customers, suppliers, investors and other associated third parties, now or in the future. Representative acknowledges that this prohibition extends to remarks, comments and statements made via social media to anyone, including, but not limited to, the news media, industry analysts, competitors, vendors, and past, existing or prospective employees and customers. This Section 23 does not, in any way, restrict or impede Representative from exercising protected rights, including rights under the National Labor Relations Act or the federal securities laws, including the Dodd-Frank Act, to the extent that such rights cannot be waived by agreement or from complying with any applicable law or regulation or a valid order of a court of competent jurisdiction or an authorized government agency, provided that such compliance does not exceed that required by such law, regulation or order. Representative shall promptly provide written notice of any such order to Alder's then President or General Counsel.

24. Media Restrictions. Representative hereby acknowledges and recognizes (i) the valuable role media plays in disseminating news to the public, and (ii) Alder's legitimate business interest in coordinating responses to questions from news media regarding Alder so as to ensure that the information provided is accurate and consistent. Accordingly, Representative hereby acknowledges and agrees that:

(a) All requests from the media for information regarding Alder, its affiliates, or any of their respective employees, customers, policies, internal communications, sales processes, etc., are to be directed to Alder's General Counsel;

(b) If asked by a reporter to comment on any matter relating to Alder, its affiliates, or any of their respective employees, customers, policies, internal communications, sales processes, etc., then Representative shall respectfully decline to comment and shall direct such questions and requests to Alder's General Counsel;

(c) The failure of Representative to comply with this Section 24 may result in disciplinary action, including, without limitation, Representative's suspension or termination for Cause; and

(d) Nothing in this Section 24 is intended to restrict communications or actions protected or required by state or federal law.

25. LIMITATION OF LIABILITY.

(a) IN NO EVENT SHALL ALDER OR ANY OF ITS REPRESENTATIVES BE LIABLE UNDER THIS AGREEMENT TO REPRESENTATIVE OR ANY THIRD PARTY FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR ENHANCED DAMAGES, LOST PROFITS OR

REVENUES OR DIMINUTION IN VALUE, ARISING OUT OF, OR RELATING TO, AND/OR IN CONNECTION WITH ANY BREACH OF THIS AGREEMENT, REGARDLESS OF (A) WHETHER SUCH DAMAGES WERE FORESEEABLE, (B) WHETHER OR NOT REPRESENTATIVE WAS ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND (C) THE LEGAL OR EQUITABLE THEORY (CONTRACT, TORT OR OTHERWISE) UPON WHICH THE CLAIM IS BASED.

(b) IN NO EVENT SHALL ALDER'S AGGREGATE LIABILITY ARISING OUT OF OR RELATED TO THIS AGREEMENT, WHETHER ARISING OUT OF OR RELATED TO BREACH OF CONTRACT, TORT (INCLUDING NEGLIGENCE) OR OTHERWISE, EXCEED THE TOTAL OF THE AMOUNTS PAID AND AMOUNTS ACCRUED BUT NOT YET PAID TO REPRESENTATIVE PURSUANT TO THIS AGREEMENT IN THE 12-MONTH PERIOD PRECEDING THE EVENT GIVING RISE TO THE CLAIM.

26. <u>Indemnification</u>. Representative shall indemnify and hold harmless, and at Alder's request defend, Alder and its affiliates, successors and assigns (and its and their officers, directors, employees, customers and agents) from and against any and all claims, losses, liabilities, damages, settlements, expenses and costs of whatever kind (including, without limitation, attorneys' fees and court costs) which arise out of or relate to (a) any breach (or claim or threat thereof that, if true, would be a breach) of this Agreement by Representative, including, without limitation, any breach or alleged breach of any representation or warranty of Representative; or (b) bodily injury, death of any person, or damage to real or tangible, personal property resulting from Representative's acts or omissions.

27. <u>Miscellaneous</u>.

(a) This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior or contemporaneous representations, negotiations, conditions, communications and agreements, whether oral or written, including, but not limited to any addendum, between the parties relating to the subject matter hereof and all past courses of dealing or industry custom.

(b) No amendment, modification or waiver of any provision of this Agreement shall be effective unless in writing and signed by duly authorized signatories of each of the parties.

(c) The waiver by any party of a default under any provision of this Agreement shall not be construed as a waiver of any subsequent default under the same or any other provision of this Agreement, nor shall any delay or omission on the part of a party to exercise or avail itself of

any right or remedy that it has or may have hereunder operate as a waiver of any right or remedy.

(d) This Agreement shall be governed by and construed in accordance with the internal laws of the State of Utah without giving effect to any choice or conflict of law provision or rule (whether of the State of Utah or any other jurisdiction) that would cause the application of laws of any jurisdiction other than those of the State of Utah.

(e) Should legal action arise concerning this Agreement, the prevailing party shall be entitled to recover all reasonable attorneys' fees and related costs, in addition to any other relief that may be awarded by any court or other tribunal of competent jurisdiction.

(f) All disputes and controversies arising out of or in connection with this Agreement or the transactions contemplated hereby shall be resolved exclusively by the state and federal courts located in Salt Lake County in the State of Utah, and each party hereto agrees to submit to the jurisdiction of said courts and agrees that venue shall lie exclusively with such courts. Each party hereby irrevocably waives, to the fullest extent permitted by applicable law, any objection which such party may raise now, or hereafter have, to the laying of the venue of any such suit, action or proceeding brought in such a court and any claim that any such suit, action or proceeding brought in such a court has been brought in an inconvenient forum. Each party agrees that, to the fullest extent permitted by applicable law, a final judgment in any such suit, action, or proceeding brought in such a court shall be conclusive and binding upon such party, and may be enforced in any court of the jurisdiction in which such party is or may be subject by a suit upon such judgment.

(g) REPRESENTATIVE EXPRESSLY WAIVES, TO THE FULL EXTENT PERMITTED BY APPLICABLE LAW, THE RIGHT TO PARTICIPATE IN, OR TO BE A MEMBER OF, ANY CLASS ACTION OR COLLECTIVE ACTIONS AGAINST ALDER OR ANY OF ITS AFFILIATES. REPRESENTATIVE AGREES THAT ANY CLAIM BY REPRESENTATIVE AGAINST ALDER OR ANY OF ITS AFFILIATES WILL BE BROUGHT IN REPRESENTATIVE'S INDIVIDUAL CAPACITY AND NOT AS A PLAINTIFF OR CLASS MEMBER IN ANY PURPORTED CLASS OR REPRESENTATIVE PROCEEDING. NOTHING IN THIS <u>SECTION 27(g)</u> IN ANY WAY PROHIBITS OR IS INTENDED TO RESTRICT OR IMPEDE REPRESENTATIVE FROM EXERCISING REPRESENTATIVE'S RIGHTS, IF ANY, TO FILE UNFAIR LABOR PRACTICE CHARGES WITH THE NATIONAL LABOR RELATIONS BOARD.

(h) TO THE EXTENT PERMITTED BY LAW, EACH PARTY HEREBY WAIVES ITS RIGHTS TO A TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF OR RELATED TO THIS AGREEMENT. EACH PARTY HEREBY AGREES THAT ANY SUCH CLAIM OR

A032

CAUSE OF ACTION SHALL BE TRIED BY A COURT TRIAL WITHOUT A JURY. WITHOUT LIMITING THE FOREGOING, THE PARTIES FURTHER AGREE THAT THEIR RESPECTIVE RIGHT TO A TRIAL BY JURY IS WAIVED BY OPERATION OF THIS SECTION AS TO ANY ACTION, COUNTERCLAIM OR OTHER PROCEEDING THAT SEEKS, IN WHOLE OR IN PART, TO CHALLENGE THE VALIDITY OR ENFORCEABILITY OF THIS AGREEMENT, OR ANY PROVISION HEREOF. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT.

(i)   Representative acknowledges that Alder has entered into this Agreement on the basis of the particular abilities of Representative. Accordingly, Representative shall not and shall not have the right to assign, sell, transfer, delegate or otherwise dispose of, whether voluntarily or involuntarily, by operation of law or otherwise, this Agreement or any of Representative's rights or obligations hereunder without the prior written consent of Alder. Notwithstanding the foregoing, Alder shall be entitled to assign any of its rights and delegate any of its obligations hereunder, whether voluntarily or involuntarily, by operation of law or otherwise. IN ADDITION, IN CONJUNCTION WITH A CONTRACT SALE, ALDER SHALL BE ENTITLED TO ASSIGN ITS RIGHTS AND BENEFITS UNDER SECTIONS 19(d) and 19(e) RELATING TO THE CONTRACT SOLD OR OTHERWISE TRANSFERRED IN SUCH CONTRACT SALE TO THE PURCHASER OF SUCH CONTRACT. Any purported assignment or delegation in violation of this Section 27(i) shall be null and void. Except as set forth in Section 4, this Agreement is for the sole benefit of the parties hereto and their respective successors and permitted assigns and nothing herein, express or implied, is intended to or shall confer upon any other person or entity any legal or equitable right, benefit or remedy of any nature whatsoever under or by reason of this Agreement. Subject to the foregoing, this Agreement shall be binding upon and inure to the benefit of the parties and their respective successors and permitted assigns.

(j)   In the event that any of the provisions of this Agreement shall be held by a court or other tribunal of competent jurisdiction to be invalid or unenforceable, the remaining portions hereof shall remain in full force and effect and such provision shall be enforced to the maximum extent possible so as to affect the intent of the parties and shall be reformed to the extent necessary to make such provision valid and enforceable.

(k)   All notices, requests, consents, claims, demands, waivers and other communications hereunder shall be in writing and shall be deemed to have been given (i) when delivered by hand (with written confirmation of receipt); (ii) when received by the addressee if sent by a nationally recognized overnight courier (receipt requested); (iii) on the date sent by facsimile (with confirmation of transmission) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; (iv) on the date sent by e-mail with confirmation of receipt by intended recipient such as by the "return receipt requested" function, as available, return email or other written confirmation) if sent during normal business hours of the recipient, and on the next business day if sent after normal business hours of the recipient; or (v) on the third day after the date mailed, by certified or registered mail, return receipt requested, postage prepaid. Such communications must be sent to the party's address set forth in the initial paragraph (or at such other address as shall be specified by such party in a notice given in accordance with this Section 27(k), provided, that all communications sent to Alder shall be sent to the attention of Alder's then General Counsel.

(l)   This Agreement may be executed in multiple counterparts, each of which shall be deemed an original Agreement upon the signature by each of the parties on at least one counterpart, but all of which shall be deemed to be one and the same document. Delivery of an executed version of this Agreement by facsimile transmission, email or other electronic means shall be effective as delivery of a manually executed counterpart hereof.

(m) THE PARTIES HEREBY ACKNOWLEDGE AND AGREE THAT THIS AGREEMENT DOES NOT, AND WILL NOT, CREATE ANY OBLIGATION ON BEHALF OF ALDER TO RETAIN REPRESENTATIVE AFTER THE TERMINATION OF THIS AGREEMENT.

(n) REPRESENTATIVE HAS HAD THE OPPORTUNITY TO CONSULT LEGAL COUNSEL CONCERNING THIS AGREEMENT AND HAS OBTAINED AND CONSIDERED THE ADVICE OF SUCH LEGAL COUNSEL TO THE EXTENT REPRESENTATIVE DEEMS NECESSARY OR APPROPRIATE, THAT REPRESENTATIVE HAS READ AND UNDERSTANDS THE AGREEMENT, THAT REPRESENTATIVE IS FULLY AWARE OF ITS LEGAL EFFECT, AND THAT REPRESENTATIVE HAS ENTERED INTO IT FREELY BASED ON REPRESENTATIVE'S OWN JUDGMENT AND NOT ON ANY REPRESENTATIONS OR PROMISES OTHER THAN THOSE CONTAINED HEREIN.

    IN WITNESS WHEREOF, the parties have executed this Sales Finishing Representative Agreement as of the Effective Date.

ALDER:                                          REPRESENTATIVE:

ALDER HOLDINGS, LLC


By: _____          Name: _____
Name: _____                            Raydell Mason
Title: _____

Alder Holdings, LLC                          Signature Page                    Initials: _____
Sales Finishing Representative Agreement (Tier II SFR)                          Ver. Apr-2022

A034