IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| JASON ROIG,<br><br>Plaintiff,<br><br>v.<br><br>ALDER HOLDINGS, LLC, a Utah limited liability company,<br><br>Defendant. | **MEMORANDUM DECISION AND ORDER DENYING MOTION TO DISMISS AND GRANTING MOTION TO CERTIFY CLASS**<br><br>Case No. 2:23-cv-721-TC-JCB<br><br>Judge Tena Campbell<br>Magistrate Judge Jared C. Bennett |

Before the court are two renewed motions that the parties filed after the court permitted limited discovery on the question of whether Plaintiff Jason Roig waived his right to pursue a collective action against Defendant Alder Holdings, LLC (Alder) under the Fair Labor Standards Act (FLSA). First, Alder moves to dismiss the complaint or strike Mr. Roig's collective action allegations—or, in the alternative, for partial summary judgment on the ground that Mr. Roig has waived his right to participate in a collective action. (ECF No. 50.) Mr. Roig opposes that motion and moves the court for a conditional certification of a collective action against Alder under 29 U.S.C. § 216(b). (ECF No. 49.)

For the reasons stated below, the court denies Alder's motion to dismiss or strike, denies Alder's alternative motion for partial summary judgment, and grants Mr. Roig's motion for the conditional certification of a collective action.

## PROCEDURAL BACKGROUND

Mr. Roig filed his complaint on October 11, 2023. (Compl., ECF No. 1.) He alleges that Alder, a home security door-to-door sales company, employed him as a Field Service Technician (FST) and denied him overtime wages in violation of the FLSA because the company misclassified him as an independent contractor. (Id. ¶¶ 1, 20, 31.) He asserts one cause of action against Alder for violations of 29 U.S.C. § 207 and seeks certification of a "Nationwide Collective" under 29 U.S.C. § 216(b). (Id. ¶¶ 48–54.)

The parties have previously filed motions substantially similar to the motions now pending before the court. Alder filed a motion to dismiss the action or, in the alternative, to strike any reference to the nationwide collective. (ECF No. 13.) Mr. Roig filed a motion for conditional certification of a collective action under 29 U.S.C. § 216(b). (ECF No. 26.) After determining that there were factual questions about the employment documents signed by Mr. Roig, the court denied both motions without prejudice and ordered limited discovery. (ECF No. 31.)

While that discovery was ongoing, the Magistrate Judge assigned to the case held a hearing on a motion for a protective order filed by Mr. Roig and two opt-in plaintiffs, Raydel Mason and Christen Keller. (Mot. Protective Order, ECF No. 27; Hr'g Min. Entry, Mar. 13, 2024, ECF No. 38.) The Honorable Jared C. Bennett found that a communication made by Alder's managing member, Adam Schanz, to Mr. Mason was improper "because it was intended to unduly pressure Mr. Mason to drop out of this lawsuit." (Mem. Decision & Order, Apr. 5, 2024, ECF No. 39 at 1–2.) Based on this finding, Magistrate Judge Bennett ordered Mr. Schanz and other Alder employees to obtain prior approval from the court before making any further communications to Mr. Roig, Mr. Mason, Ms. Keller, and any other putative opt-in plaintiffs.

(Id. at 9–10.)

Alder moved to amend that order, representing that Mr. Mason wished to end his participation in the lawsuit. (Mot. Amend, ECF No. 40.) The court set an evidentiary hearing, (ECF No. 44), but vacated that hearing, (ECF No. 48), and denied as moot the motion to amend, (ECF No. 47), after Mr. Roig filed a Notice of Settlement between Alder and Mr. Mason, (Not. Settlement, ECF No. 45). Concurrently, Mr. Roig also filed a notice that Ms. Keller was withdrawing her consent to sue. (Not. Withdrawal Consent, ECF No. 46.)

The limited discovery period ordered by the court ended on May 15, 2024. (ECF No. 31 at 7.) The parties then filed the renewed motions—Alder's motion to dismiss, strike, or for partial summary judgment, and Mr. Roig's motion to certify a nationwide class—that the court now addresses. The court heard argument on those motions on October 15, 2024. (Min. Entry, Oct. 15, 2024, ECF No. 66.)

Shortly before that hearing, a new opt-in plaintiff, Christopher McLeod, filed a Notice of Consent to Sue under the FLSA. (ECF No. 64.) And shortly after the hearing, Mr. Roig filed a motion for contempt, alleging that Alder violated Judge Bennett's protective order by encouraging Mr. McLeod to withdraw from the lawsuit. (ECF No. 67.) Judge Bennett set a hearing on the motion for January 21, 2025, (ECF No. 70), but Mr. Roig withdrew his motion before the hearing, citing Mr. McLeod's inability to travel to Utah due to a new job. (Not. Withdraw Mot., ECF No. 71.)

## FACTUAL BACKGROUND

The parties do not dispute that Alder hired Mr. Roig to work as an FST. (Compl. ¶ 20; ECF No. 50 at 3.) On January 16, 2023, Mr. Roig signed a document titled "Sales Finishing Representative Agreement" (the SFR Agreement). (ECF No. 50 at 3; SFR Agreement, ECF

No. 13 at 9–30.[1]) In response to the Requests for Admissions that Alder sent to Mr. Roig, Mr. Roig admitted that he signed the SFR Agreement and understood that signing the contract was a requirement for him to receive work from Alder. (Def.'s Requests for Admission, ECF No. 50 at 15.) But Mr. Roig points out that Alder's signature does not appear in the block where such a signature is contemplated for the parties to sign. (Pl.'s Opp'n Mot. Dismiss, ECF No. 54 at 3; see ECF No. 13 at 25.)

The SFR Agreement states that "Alder desires to retain Representative [i.e., Mr. Roig], and Representative desires to provide services to Alder, on the terms and conditions set forth herein." (ECF No. 13 at 9.) The SFR Agreement is just over 16 pages long, not counting disclosures under the Fair Credit Reporting Act, and contains provisions about compensation, confidentiality, and the relationship of the parties. (Id. at 12–23.) Concerning Mr. Roig's position, the document states that Alder "retains Representative as a sales finishing representative" and notes that "Representative shall assist in finishing the sales process and installing and servicing the residential and commercial security systems … and shall perform such duties and responsibilities as are commensurate with and required by such position …." (Id. at 12.) Finally, the SFR Agreement contains the following waiver:

> Representative expressly waives, to the full extent permitted by applicable law, the right to participate in, or to be a member of, any class action or collective actions against Alder or any of its affiliates. Representative agrees that any claim by Representative against Alder or any of its affiliates will be brought in Representative's individual capacity and not as a plaintiff or class member in any purported class or representative proceeding.

(ECF No. 13 at 23 (original in all caps).)

In response to the Requests for Admission that Mr. Roig sent to Alder, Alder maintains

[1] Citations refer to PDF pages, not internal document pages.

that "[a]ll FSTs are SFRs" and that "[t]he FST label is for convenience to identify SFRs that have a primary focus on making service calls …." (Pl.'s Requests for Admission, ECF No. 49-3 at 4.) Alder also asserts that "[w]hen FSTs are hired they are provided the agreement titled Sales Finishing Representative Agreement." (Id.) But Mr. Roig disputes that he ever worked as an SFR. Instead, he asserts that during his time at Alder, "all of my job duties were the duties of a FST and not a Sales Finishing Representative." (Decl. Jason Roig ¶ 5, ECF No. 54-2.) Mr. Roig further maintains that he "was never involved in making any sales for Defendant" and that his "duties as a FST included but were not limited to installing and performing maintenance on a number of devices already sold by Defendant including touchscreen panels, indoor and outdoor cameras, and door and window sensors." (Id. ¶¶ 7–8.)

On February 9, 2023, Mr. Roig signed an additional document (the Offer Letter) stating that Alder was "pleased to offer [Mr. Roig] employment with [Alder]." (Offer Letter, ECF No. 54-1 at 2.) The Offer Letter stated that Alder was hiring Mr. Roig as a Field Service Technician starting on January 16, 2023. (Id.) The Offer Letter contained information about Mr. Roig's compensation, a required background screening, and required licensing, as well as a statement that "[t]his offer is contingent upon you agreeing to thoroughly reviewing and understanding the Employee Handbook and to abide by and follow the policies, rules, regulations and procedures outlined therein." (Id.) Finally, the Offer Letter stated that, assuming Mr. Roig accepted the job offer and returned a signed copy of the letter, Alder would "send you additional information to complete before your first day." (Id. at 3.)

Adler's online employment file for Mr. Roig reflected his position and job title as a "Field Service Technician." (Review Events Summ., ECF No. 54-3 at 2.) His file also contained Mr. Roig's electronic signature indicating that he had read and reviewed the following

documents: the Alder Employee Handbook, the Alder Confidentiality Agreement, and the Alder Inventions Agreement. (Id. at 4.) Neither the online employment file nor the Offer Letter refer to the SFR Agreement.

Mr. Roig asserts that he worked for Alder until April 18, 2023. (Compl. ¶ 35.) It appears that he did not begin that work until after he signed the Offer Letter on February 9, 2023. This assumption accords with an assertion made by Alder's counsel at the hearing on the parties' first motions that Mr. Roig only worked for Alder about seven weeks. (See ECF No. 31 at 2 n.2.) While working for Alder, Mr. Roig was required to wear an Alder uniform and identification badge. (Compl. ¶¶ 25–27.) Mr. Roig avers that the badge identified him as a "Service Technician." (Roig Decl. ¶ 4.) He alleges that Alder compensated him based on the number of projects completed, regardless of the time it took to complete a project. (Compl. ¶¶ 28–29.) He asserts that he was required to work overtime and was not compensated for his overtime hours. (Id. ¶¶ 23, 33.) Finally, he contends that he was aware of at least 35 other FSTs who were similarly misclassified as independent contractors and denied overtime wages.[2] (See id. ¶ 43.)

## LEGAL STANDARD

### I. Motion to Dismiss

To survive a motion to dismiss, the factual allegations in a complaint must raise a plausible right to relief. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 554–56 (2007). A claim is facially plausible when the plaintiff pleads enough factual content to justify the reasonable inference the defendant is liable for the misconduct alleged. Ashcroft v. Iqbal, 556 U.S. 662, 678

[2] Mr. Mason and Ms. Keller filed Notices of Consent to Sue under FLSA, (ECF Nos. 24 & 25), and submitted declarations in support of Mr. Roig's first Motion to Certify Class, (ECF Nos. 24-1 & 25-1). As noted above, these employees have withdrawn their notices. But a third opt-in plaintiff, Mr. McLeod, has filed a Notice of Consent to Sue. (ECF No. 64.)

(2009). And while factual allegations asserted in a complaint are accepted as true for purposes of a motion to dismiss, conclusory allegations in a complaint are not entitled to such deference and are insufficient to state a claim. Id.

## II. Motion to Strike

Under Rule 12(f) of the Federal Rules of Civil Procedure, "[t]he court may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." But the "use of Rule 12(f) to strike class allegations is generally 'disfavored in practice.'" Curry v. Fields Gifts, Inc., 744 F. Supp. 3d 1251, 1262 (D. Utah 2024) (quoting Manning v. Bos. Med. Ctr. Corp., 725 F.3d 34, 59 (1st Cir. 2013)). Indeed, the use of Rule 12(f) to shortcut class certification

> is even more disfavored because it requires a reviewing court to preemptively terminate the class aspects of … litigation, solely on the basis of what is alleged in the complaint, and before plaintiffs are permitted to complete the discovery to which they would otherwise be entitled on questions relevant to class certification.

Id. (quoting Manning, 725 F.3d at 59). But "[i]f it is obvious from the pleadings that the proceeding cannot possibly move forward on a classwide basis, district courts use their authority under Federal Rule of Civil Procedure 12(f) to delete the complaint's class allegations." Manning, 725 F.3d at 59.

## III. Motion for Summary Judgment

"A court shall grant summary judgment if 'the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Birch v. Polaris Indus., Inc., 812 F.3d 1238, 1251 (10th Cir. 2015) (quoting Fed. R. Civ. P. 56(a)). Material facts are those that might affect the outcome of the case. See id. ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the

entry of summary judgment." (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986))). "At the summary judgment stage, evidence need not be submitted 'in a form that would be admissible at trial.'" Argo v. Blue Cross Blue Shield of Kan., Inc., 452 F.3d 1193, 1199 (10th Cir. 2006) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986)). But courts should disregard statements that could not be presented at trial in any admissible form. See id.

Once the movant shows there is an absence of a genuine dispute of material fact, Celotex, 477 U.S. at 323, the burden shifts to the nonmoving party to "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 248 (citation omitted). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "[W]hile [courts] draw all reasonable inferences in favor of the non-moving party, 'an inference is unreasonable if it requires a degree of speculation and conjecture that renders [the factfinder's] findings a guess or mere possibility.'" GeoMetWatch Corp. v. Behunin, 38 F.4th 1183, 1200 (10th Cir. 2022) (quoting Pioneer Ctrs. Holding Co. Emp. Stock Ownership Plan & Tr. v. Alerus Fin., N.A., 858 F.3d 1324, 1334 (10th Cir. 2017)).

## ANALYSIS

### I. The SFR Agreement Is Binding

Alder argues that the SFR Agreement (and the waiver provision contained in that document) is binding and that Mr. Roig has therefore waived his right to proceed in this lawsuit by way of a collective action. In support, Alder points to Mr. Roig's admission that he signed the document and understood that signing was a requirement for him to receive work from Alder. Given Mr. Roig's responses to Alder's Requests for Admissions, the court finds that Alder has presented sufficient evidence to show the existence of a binding contract. The court therefore

considers whether Mr. Roig has responded with specific facts to show there is a genuine dispute about whether the SFR Agreement is binding.

First, Mr. Roig maintains that the SFR Agreement is invalid because Alder did not sign the document and the agreement therefore lacks mutual assent. See Aquagen Int'l, Inc. v. Calrae Tr., 972 P.2d 411, 413 (Utah 1998) (requiring a "manifestation of mutual assent" for contract formation (quoting Restatement (Second) of Contracts, § 17(1) (1981))). The court agrees that the SFR Agreement contains a signature block and that Alder's signature is missing. But under Utah law, the presence of a signature is "not always necessary to create a binding agreement." Com. Union Assocs. v. Clayton, 863 P.2d 29, 34 (Utah Ct. App. 1993) (citation modified). Instead, Utah courts have observed that "a sound principle of contract law" is "that the parties may become bound by the terms of a contract even though they did not sign the contract, where they have otherwise indicated their acceptance of the contract, or led the other party to so believe that they have accepted the contract." Ercanbrack v. Crandall-Walker Motor Co., 550 P.2d 723, 725 (Utah 1976) (citation modified).

Here, Mr. Roig points to no express language in the SFR Agreement requiring both parties' signatures as a condition precedent to the enforceability of the contract.[3] See Livingston v. Finco Holdings Corp., 513 P.3d 94, 101 (Utah Ct. App. 2022) (holding that because a rider "did not state that signatures were required for the agreement to be enforceable …, the absence of Lender's signature did not render the agreement unenforceable"). In any event, Alder

[3] Having considered the SFR Agreement itself, the closest language the court can find to any sort of signature requirement is the following: "This Agreement may be executed in multiple counterparts, each of which shall be deemed an original Agreement upon the signature by each of the parties on at least one counterpart, but all of which shall be deemed to be one and the same document." (ECF No. 13 at 24.) But this statement about what constitutes an original document says nothing about enforceability. Accordingly, the court finds this provision insufficient to create a signature requirement.

manifested its assent to the SFR Agreement in multiple ways. Alder drafted the agreement, sent the agreement to Mr. Roig, informed him that signing the agreement was a prerequisite for work with the company, eventually hired Mr. Roig as contemplated under the agreement, and now seeks to enforce the terms of the agreement. Under Utah law, these actions constitute assent. See id. at 101–02 (finding assent in the absence of a signature where a party presented a rider, required the execution of that rider before funding a loan, eventually funded the loan, maintained the rider in the party's files, and later sought to enforce the rider). And other than the absence of a signature, Mr. Roig presents no evidence to suggest that Alder had a contrary intent. See id. (listing cases in which courts found enforceable employment agreements that employers drafted but did not sign).

Mr. Roig additionally disputes the validity of the SFR Agreement because he claims that he worked as an FST, not an SFR. Mr. Roig maintains that he "never performed duties as a Sales Finishing Representative" and that his "job duties were the duties of a FST and not a Sales Finishing Representative." (Roig Decl. ¶¶ 5, 7.) But Mr. Roig's beliefs about the duties of an SFR are contradicted by his own statements and by the terms of the SFR Agreement. That document states that an SFR's duties include "finishing the sales process and installing and servicing the residential and commercial security systems …." (ECF No. 13 at 12.) And Mr. Roig asserts that his duties as an FST included installing and maintaining security systems. (Roig Decl. ¶ 8.) Mr. Roig fails to demonstrate that he could not have been an SFR simply because he did not make any sales for Alder. In any event, Alder has submitted the declaration of its Scheduling Manager, Kace Sherwood, who asserts: "At Alder, each FST is considered an SFR." (Decl. Kace Sherwood, ECF No. 58 at 15 ¶ 8.) The court therefore finds that Mr. Roig has not shown a genuine dispute that the terms of the more general SFR Agreement were no

longer valid after Alder offered him specific employment as an FST.

Finally, Mr. Roig argues that the Offer Letter was a fully integrated contract and that the court cannot look outside the four corners of that document to determine the employment terms to which he agreed. The court is unpersuaded by this assertion. The Offer Letter is a two-page document with minimal information about Mr. Roig's employment with Alder other than his job title and compensation. The Offer Letter also references other documents, including an Employee Handbook, and states that Alder will send Mr. Roig additional information to complete before his first day if he accepts the offer. Indeed, Mr. Roig's online employment file reflects that he signed the Employee Handbook and "received, read, and [understood]" the Alder Confidentiality Agreement and the Alder Inventions Agreement. (ECF No. 53-4 at 4.) The Offer Letter cannot be a fully integrated document reflecting the entire extent of the relationship between the parties.

Moreover, the Offer Letter does not contain a merger clause—whereas the SFR Agreement does. Specifically, the SFR Agreement states:

> This Agreement constitutes the entire agreement between the parties concerning the subject matter hereof and supersedes all prior or contemporaneous representations, negotiations, conditions, communications and agreements, whether oral or written, including, but not limited to any addendum, between the parties relating to the subject matter hereof and all past courses of dealing or industry custom.

(ECF No. 13 at 23.) While Mr. Roig could conceivably argue that the Offer Letter and accompanying documents, such as the Employee Handbook and the Alder Confidentiality Agreement, conflict with the SFR Agreement, he has not submitted copies of these documents or shown that any provisions of the SFR Agreement were superseded.

For these reasons, the court finds that Alder has carried its burden to show that Mr. Roig signed the SFR Agreement and understood that his assent to the provisions in that agreement

were a prerequisite for obtaining any work from Alder. Mr. Roig therefore remains bound by the terms of the provision in which he waived his right to participate in or become a member of any class or collective action against Alder.

**II. The Waiver Provision is Not Enforceable**

But the court's finding that Mr. Roig is bound by the terms of the SFR Agreement does not doom his case. Because Alder has established that the SFR Agreement is a valid contract, the court must now decide the legal question that was not yet ripe for consideration while outstanding factual issues remained—namely, whether an employee may waive their right to collective action under the FLSA.

The court finds that this right is non-waivable. The parties, and this court, agree that neither the Supreme Court nor the Tenth Circuit has squarely answered this specific question. Nevertheless, the court finds that a number of factors mandate this result. They include: the plain text of the statute, King v. Burwell, 576 U.S. 473, 486 (2015) ("If the statutory language is plain, [the Court] must enforce it according to its terms." (citation omitted)); the fact that the Supreme Court has already considered whether other provisions of the FLSA are waivable and found that they are not, Brooklyn Sav. Bank v. O'Neil, 324 U.S. 697, 706 (1945); the Sixth Circuit's persuasive analysis of this question, which led it to the conclusion that the right to collective action is non-waivable where, as here, no arbitration agreement is also present, Killion v. KeHE Distribs, LLC, 761 F.3d 574, 592 (6th Cir. 2014); and the Tenth Circuit's thoughtful analysis of the historical factors behind the amendment to the FLSA that established the collective action right, a history which demonstrates that this right was the product of careful congressional balancing, see Dolan v. Project Const. Corp., 725 F.2d 1263, 1266–67 (10th Cir. 1984).

The court's inquiry into the meaning of the FLSA "begins with the statutory text, and ends there as well if the text is unambiguous." BedRoc Ltd., LLC v. United States, 541 U.S. 176, 183 (2004) (collecting cases). The Supreme Court has "stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there." Conn. Nat'l Bank v. Germain, 503 U.S. 249, 253–54 (1992) (collecting cases). Under the FLSA, an employee or employees may maintain an action against an employer "for and in behalf of himself or themselves and other employees similarly situated." 29 U.S.C. § 216(b). And the statute specifies the point at which the right to bring an action or to become a party plaintiff to any such action terminates: "upon the filing of a complaint by the Secretary of Labor . . . ." Id. In other words, employees have the right to bring or participate in a collective action to enforce the provisions of the FLSA unless and until the Department of Labor decides to file an action itself. Absent ambiguity, and the court finds none here, the court must enforce the statute as written.

Of course, statutory interpretation is less straightforward where Congress has enacted two statutes that are in tension. Here, the court must consider the interplay between the FLSA and the Federal Arbitration Act (FAA), 9 U.S.C. §§ 1–16. The Supreme Court has held that the FAA reflects the "liberal federal policy favoring arbitration agreements." Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 625 (1985) (citation omitted). And given that the FAA "is at bottom a policy guaranteeing the enforcement of private contractual arrangements[,]" id., it is unsurprising that arbitration agreements sometimes clash with other statutory directives, such as a congressional provision for collective or class actions in various statutes, see, e.g., Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 32 (1991) (recognizing that arbitration agreements will sometimes preclude collective relief even where a statute provides for the

possibility of bringing a collective action). Consistent with the text and purpose of the FAA, the Supreme Court has held that in such cases the "courts must rigorously enforce arbitration agreements according to their terms … unless the FAA's mandate has been overridden by a contrary congressional command." Am. Express Co. v. Italian Colors Rest., 570 U.S. 228, 233 (2013) (cleaned up). Accordingly, where a plaintiff seeks to avoid the terms of an arbitration agreement, it is the plaintiff's burden to show that Congress intended to create a non-waivable right that cannot be contracted around. See Gilmer, 500 U.S. at 35.

But there is no conflicting arbitration agreement here. As a result, the court finds no reason to impose additional hurdles on a party seeking to access a right provided by Congress. At the very least, the burden should rest on the party seeking to create an exception to the clear statutory text to show that Congress intended the right to be waivable, rather than requiring the party seeking to access the right to prove that Congress really meant what it said.

This interpretation is consistent with the Supreme Court's analysis of the FLSA. In 1945, the Court examined whether the provision in § 216(b) allowing a successful FLSA plaintiff to collect liquidated damages was waivable. Brooklyn Sav. Bank, 324 U.S. at 706. The Court noted that the FLSA was enacted in 1938 with "the prime purpose" of "aid[ing] the unprotected, unorganized and lowest paid of the nation's working population; that is, those employees who lacked sufficient bargaining power to secure for themselves a minimum subsistence wage." Id. at 707 n.18 (citations omitted). Congress recognized that "due to the unequal bargaining power as between employer and employee, certain segments of the population required federal compulsory legislation to prevent private contracts on their part which endangered national health and efficiency and as a result the free movement of goods in interstate commerce." Id. at 706–07. The FLSA provided standards for minimum wages and maximum hours to

accomplish this purpose, and the Court noted that "[n]o one c[ould] doubt but that to allow waiver of statutory wages by agreement would nullify the purposes of the Act." Id. at 707.

The Court then noted that § 216(b) was "mandatory in form." Id. at 710. But the Court also recognized that Congress had not included, as it had in some other federal statutes, "specific provisions prohibiting waiver of rights under the acts involved …." Id. at 712. Nevertheless, the Court found that the "[a]bsence of such provisions … has not prevented the courts from invalidating waivers where the legislative policy would be thwarted by permitting such contracts." Id. at 713. "Failure to provide a method of waiving claims under the Act can support contrary inferences, that such waivers were to be allowed or that the provisions of the Act state a settled policy which cannot be modified by private contracts." Id. The Court then held that, based on the legislative history[4] and provisions of the law, Congress intended to prohibit waiver of rights under the FLSA. Id. The Court therefore invalidated the purported waiver of liquidated damages that was at issue. Id. at 713–14.

Although the Court did not specifically consider the FLSA's collective action provision,[5] the Court's reasoning in Brooklyn Savings Bank encompasses the statute as a whole and does

---

[4] The Court observed that references to § 216(b) in the legislative history were sparse, mostly comprising a speech by one representative. Id. at 706 n.16. Notably, however, that speech evinced a strong preference for providing employees with the means of enforcing their rights under the Act: "[Section 216(b)] puts directly into the hands of the employees who are affected by violation the means and ability to assert and enforce their own rights, thus avoiding the assumption by Government of the sole responsibility to enforce the act." Id. (quoting 83 Cong. Rec. 9264 (1938) (statement of Rep. Kent Keller)). And as a means of enforcing their rights, the representative observed that "employees can themselves, or by designated agent or representatives, maintain an action in any court to recover the wages due them …." Id. (citation omitted). Finally, the representative stated that the proposed enforcement mechanism "ha[d] the further virtue of minimizing the cost of enforcement by the Government." Id. (citation omitted).

[5] Nor could it have. As discussed further below, the original statute included a different provision, which provided employees with the right to bring a class action. Congress replaced that right with the collective action provision when it amended the FLSA two years after the Supreme Court decided Brooklyn Savings Bank.

not distinguish between various provisions. It is therefore unsurprising that the only circuit court to have considered whether the collective action right is waivable in the absence of an arbitration agreement has found that it is not. See Killion, 761 F.3d at 592; Salim v. Garland, No. 23-9563, 2024 WL 2768195, at *5 (10th Cir. May 30, 2024) ("Given the lack of binding authority from our circuit, [courts may] look to persuasive out-of-circuit authority to guide [their] decision."). The Sixth Circuit held that, in the absence of an arbitration agreement, there was "no countervailing federal policy that outweighs the policy articulated in the FLSA." Killion, 761 F.3d at 592. The court noted that, "in cases where each individual claim is small, having to litigate on an individual basis would likely discourage the employee from bringing a claim for overtime wages." Id. As a result, the Sixth Circuit found a non-waivable right to collective action where no arbitration agreement was also present. Id.

Other circuit courts have adopted a different approach, finding that a plaintiff may waive their right to participate in collective action. See Walthour v. Chipio Windshield Repair, LLC, 745 F.3d 1326, 1334–35 (11th Cir. 2014) (affirming dismissal based on employee's waiver of right to pursue collective action and concluding that "the text of FLSA § 16(b) does not set forth a non-waivable substantive right to a collective action"); Sutherland v. Ernst & Young LLP, 726 F.3d 290, 296–97 & n.6 (2d Cir. 2013) (holding that the FLSA collective action right is waivable); Vilches v. The Travelers Cos., Inc., 413 F. App'x 487, 494 (3d Cir. 2011) (finding no unconscionability in enforcing contractual waiver of collective action right); Adkins v. Labor Ready, Inc., 303 F.3d 496, 503 (4th Cir. 2002) (determining plaintiff had pointed to nothing in the "text, legislative history, or purpose of the FLSA" to suggest that "Congress intended to confer a nonwaivable right to a class action"); Carter v. Countrywide Credit Indus., Inc., 362 F.3d 294, 298 (5th Cir. 2004) (rejecting claim that plaintiffs had been deprived of a substantive

right to proceed collectively under the FLSA); Owen v. Bristol Care, Inc., 702 F.3d 1050, 1055 (8th Cir. 2013) (reversing trial court decision that found right to collective action under the FLSA was non-waivable).

But as the Sixth Circuit recognized, "the respective waiver agreements in all of the above-cited cases included provisions subjecting the employees to arbitration." Killion, 761 F.3d at 591. The Sixth Circuit found that these decisions rested on the Supreme Court's favorable treatment of arbitration agreements under the FAA. See id.; see also Am. Express, 570 U.S. at 233 (finding that, "consistent with th[e] text" of the FAA, "courts must rigorously enforce arbitration agreements according to their terms ….") (cleaned up); Gilmer, 500 U.S. at 35 ("We conclude that Gilmer has not met his burden of showing that Congress, in enacting the ADEA, intended to preclude arbitration of claims under that Act."). The court agrees with the Sixth Circuit's analysis and finds that authority from other circuits is less persuasive than the Sixth Circuit's opinion because those courts have not directly addressed the question that is at issue here.

The Defendants point out that district courts outside the Sixth Circuit have generally not followed the holding in Killion. (See Def.'s Mot. Dismiss, ECF No. 50 at 7–8 (collecting cases).) Indeed, some district courts have found that the FLSA's collective action provision may be waived even in the absence of an arbitration provision. See, e.g., Feamster v. Compucom Sys., Inc., No. 7:15-cv-564, 2016 WL 722190, at *3 (W.D. Va. Feb. 19, 2016). But the majority of the district court decisions cited by the Defendants were issued by district courts in the Second, Third, Fourth, Fifth, Eighth, and Eleventh Circuits, which, as discussed above, have found that the collective action right is waivable. Because this court finds that this circuit precedent is unpersuasive, this court declines to rely on district court decisions from courts

within those circuits. And while the Defendants also cite two district court decisions from the Tenth Circuit, this court finds those decisions similarly unpersuasive because both cases involved an arbitration agreement; these courts therefore did not consider how the Tenth Circuit would rule in the absence of such an agreement. See Rahim v. CSAA Ins. Servs., Inc., No. CIV-17-220, 2017 WL 11727746, at *9 (W.D. Okla. Sept. 29, 2017); Bell v. Ryan Transp. Serv., Inc., 176 F. Supp. 3d 1251, 1261–62 (D. Kan. 2016).

The Fifth Circuit has also declined to rely on Killion, noting that the ruling was an out-of-circuit decision that held "contrary to Fifth Circuit precedent that the FLSA's provision for class actions conveys a right that cannot be waived …." Convergys Corp. v. N.L.R.B., 866 F.3d 635, 638 n.6 (5th Cir. 2017). But that ruling is of similarly unpersuasive value because the Fifth Circuit was presented with a question distinct from the question presented here: namely, whether the National Labor Relations Board (NLRB) had correctly held that an employer violated the NLRA by requiring job applicants to sign a waiver of their right to participate in any class or collective action as a prerequisite for employment. Id. at 636. The court ruled against the Board's position, noting that the court had previously rejected the Board's suggestion that Section 7 of the NLRA[6] guaranteed a right to participate in class or collective actions. Id. at 637–38 (citing D.R. Horton, Inc. v. N.L.R.B., 737 F.3d 344, 357 (5th Cir. 2013)).

A year later, the Supreme Court issued a decision addressing a similar question to the issue presented before the Fifth Circuit, holding that an employee could forego their FLSA right to collective action in an arbitration agreement without running afoul of the NLRA. Epic Sys.

[6] Section 7 states as follows: "Employees shall have the right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection …." 29 U.S.C. § 157.

Corp. v. Lewis, 584 U.S. 497, 524 (2018). The Court observed that "the FLSA expressly authorizes [class or collective actions] yet allows parties to contract for bilateral arbitration instead." Id.[7] But this case again focused on the tension between the FAA and other statutes. Outside its more general discussion of the FLSA in Brooklyn Savings Bank, the Supreme Court has not yet squarely addressed the question of whether the FLSA collective action right is waivable when it is not tied to an arbitration provision. And notably, the Supreme Court did not characterize the FLSA's collective action provision as "waivable," but merely observed that the FLSA did not prohibit bilateral arbitration agreements.

There are two additional reasons why the court is unpersuaded by circuit court authorities holding that the collective action right is waivable: first, the court is unable to discern a clear distinction between procedural and substantive rights; and second, the passage of the FLSA and its subsequent amendment suggest that the collective action right was the product of a careful congressional compromise.

Several circuit courts have distinguished the right to participate in class or collective actions as a procedural rather than a substantive right. See, e.g., Convergys Corp., 866 F.3d at 637–38 (noting previous Fifth Circuit cases "holding that the use of a class or collective action is a procedure rather than a substantive right" (citations omitted)); Sutherland, 726 F.3d at 297 n.6 (distinguishing a "procedural mechanism" from a "non-waivable, substantive right" (citations

[7] The Court cited § 216(b) and Gilmer, 500 U.S. at 32, for this proposition, and did not elaborate further. But Gilmer was a case about the ADEA. Although the ADEA borrowed the collective action provision from the FLSA, anti-discrimination statutes like the ADEA have distinct purposes. As the Sixth Circuit noted, "an employer that pays an employee less than minimum wage arguably gains a competitive advantage by doing so." Boaz v. FedEx Customer Info. Servs., Inc., 725 F.3d 603, 606 (6th Cir. 2013) (citation omitted). In contrast, "[a]n employer who refuses to hire African-Americans or some other racial group does not." Id. The Supreme Court therefore has yet to examine whether compulsory arbitration under an arbitration agreement is consistent with the statutory framework and purposes of the FLSA.

omitted)). For instance, the Eleventh Circuit relied on this distinction to explain why the Supreme Court's decision in Brooklyn Savings Bank was not controlling. Walthour, 745 F.3d at 1336–37. The Eleventh Circuit did not discuss the points raised by the Supreme Court about the legislative history and statutory purpose of the FLSA, or the Court's discussion of whether Congress intended to allow for the waiver of rights under the statute. See id. Instead, the Eleventh Circuit determined that the Supreme Court case was not applicable because liquated damages were a substantive, not a procedural, right. Id. at 1337.

The court finds this distinction illusory, and nearly circular. "Except at the extremes, the terms 'substance' and 'procedure' precisely describe very little except a dichotomy, and what they mean in a particular context is largely determined by the purposes for which the dichotomy is drawn." Sun Oil Co. v. Wortman, 486 U.S. 717, 726 (1988). For example, if liquidated damages are a substantive right, and collective action is a procedural right, what about the right to attorney's fees? May an employer require a prospective employee to waive her right to attorney's fees in an FLSA case? The FLSA also provides that an employee may bring a claim "in any Federal or State court of competent jurisdiction …." 29 U.S.C. § 216(b). Absent an arbitration agreement, may an employer require an employee to waive her right to file an FLSA claim in federal court? Consider also the relevant statute of limitations under the FLSA. See 29 U.S.C. § 255(a) (requiring an FLSA claim to be brought within two years, or within three years for willful violations). May parties contract around this requirement by either lengthening or shortening this period?

Prior to its decision in Killion, the Sixth Circuit addressed this last question and invalidated a provision in an employment contract that would have required the employee to bring any legal action within six months. See Boaz, 725 F.3d at 605–07. It is telling that, having

previously considered whether parties could waive the FLSA's statute of limitations, the Sixth Circuit then extended the same reasoning to prohibit waiver of the FLSA's collective action right. In contrast, courts that have first been asked whether the FLSA's collective action right supersedes an arbitration agreement have found the right waivable and have not reconsidered whether such a waiver is supported in the absence of an arbitration agreement. While the characterization of the FLSA's collective action right as a procedural right is helpful for resolving the tension between the FLSA and the FAA, the court finds that dividing congressional statutes into procedural and substantive rights, especially where there is no countervailing federal interest that requires such division, risks opening up a can of worms.

In any event, it is unclear how liquidated damages, which under the FLSA are equal to the amount of unpaid minimum wages or overtime compensation, 29 U.S.C. § 216(b), are more important to accomplishing the purposes of the statute than the right to proceed by collective action, in which employees who might otherwise be discouraged from litigation due to the size of their claim can join together with other employees, see Killion, 761 F.3d at 592. Not only may it be prohibitively expensive to bring an individual claim, but the "[f]ear of retaliation may also deter potential claimants from seeking redress alone." Epic Sys., 584 U.S. at 551 (Ginsburg, J., dissenting). And although the Department of Labor is empowered to bring enforcement actions, the Department investigates fewer than 1% of FLSA-covered employers each year. Id. at 550 (citing Glover, The Structural Role of Private Enforcement Mechanisms in Public Law, 53 Wm. & Mary L. Rev. 1137, 1150–51 (2012)). Finally, the historical context of the statute suggests that Congress was fully aware of the importance of collective actions to vindicate workers' interests, given that Congress passed the FLSA at a time when it was concerned about workers' rights and collective action, and shortly after "legislative efforts to safeguard vulnerable

workers found more receptive audiences." Id. at 529. For instance, Congress passed the Norris-LaGuardia Act in 1932 and the National Labor Relations Act in 1935, both statutes that aimed to protect employees' associational rights. Id. at 529–30.

For these reasons, the court is not persuaded by the Eleventh Circuit's statement that "the portions of the FLSA's legislative history plaintiffs cite do not show that Congress intended the collective action provision to be essential to the effective vindication of the FLSA's rights." Walthour, 745 F.3d at 1335.[8] Although the Eleventh Circuit noted that it had "examin[ed] the FLSA's text, legislative history, purposes," and discerned "no explicit provision precluding arbitration or a waiver of the right to collective action[,]" id. at 1334, the collective action provision at issue in the current version of the statute did not exist when the statute was passed in 1938, and the Eleventh Circuit did not examine the relevant amendment that provided for collective action.

In contrast, the Tenth Circuit has considered this history. See Dolan v. Project Const. Corp., 725 F.2d 1263, 1266–67 (10th Cir. 1984). As the Tenth Circuit noted:

> In its original form, the FLSA made provision for an action by an employee in behalf of himself and other employees similarly situated. However, after decisions by the United States Supreme Court interpreted the FLSA to provide for compensation that historically had not been reimbursed, a virtual flood of litigation ensued in the form of class actions. Perceiving the flood of litigation as a serious threat to interstate commerce[,] the Congress moved to limit the applicability of the FLSA to certain industry practices. Particularly relevant here, the Congress also limited the class action procedures for filing representative actions.

Id. (citation omitted). Congress did so by passing the Portal-to-Portal Act of 1947, which required prospective plaintiffs to opt in to a collective action. Id. ("The opt-in language of

[8] Evidently, the only legislative history cited by the Walthour plaintiffs were statements by Justice Robert H. Jackson, then Assistant U.S. Attorney General, that related to a provision which was dropped from the final version of the FLSA. Id. at 1335 n.9.

§ 216(b) was a direct result of this clear congressional dissatisfaction with the original class action provisions of the FLSA.").

This history demonstrates that the collective action provision of § 216(b) was the product of a careful compromise. Because the original provisions of the FLSA leaned too heavily against employers, Congress revised the statute to lessen this burden while still providing for a collective action right. Employers at the time, as well as Congress, clearly did not view the class—and later, collective—action provision of the FLSA as a waivable right. And the court is hesitant to create a judge-made exception to the careful compromise that Congress reached simply by labeling the collective action right as a procedural right.

For the reasons stated above, the court finds that Congress meant what it said and that the reasoning of the Sixth Circuit—the only circuit court to address the issue directly—is persuasive. Even assuming the FLSA allows for bilateral arbitration agreements, the Supreme Court has indicated that the statute's provisions are not otherwise optional, and the legislative and historical context in which Congress passed and amended the FLSA suggests that Congress viewed collective action as an essential enforcement mechanism. Because the Defendant has failed to demonstrate a countervailing federal interest that supersedes the rights that Congress accords employees under the FLSA, the court declines to create an exception to those rights.

## IV. Interlocutory Appeal

Under 28 U.S.C. § 1292(b):

> When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, [she] shall so state in writing in such an order.

The Defendant requests that the court make such a statement here, given the substantial

difference of opinion between courts that have considered whether the FLSA's collective action provision is waivable. The court agrees that the requirements of § 1292(b) are met and will therefore include this statement in its order.

Should the Defendant choose to seek an interlocutory appeal, that application does not automatically stay these proceedings. See id. The court finds no good cause for a stay. This matter has been pending for several years and, while the court acknowledges that the time it has required to issue an opinion on the pending motion has been the primary cause of delay, the Defendant's actions have also contributed. For instance, Judge Bennett determined that a communication from the Defendant was intended to unduly pressure one of the prospective plaintiffs from joining the suit, and it took time to resolve that issue. The court is therefore not inclined to resolve any arguments about whether a stay is appropriate in the Defendant's favor. The Plaintiff may pursue the standard procedure for certifying a collective while any appeal is ongoing.

## V. Equitable Tolling

The court finds that equitable tolling is appropriate. In an FLSA collective action, "the statute of limitations continues to run with respect to each potential plaintiff's claim until that plaintiff files a 'written consent' form opting in the suit." Gui Zhen Zhu v. Matsu Corp., 424 F. Supp. 3d 253, 268 (D. Conn. 2020) (citing 29 U.S.C. § 256). Due to the court's heavy caseload, as well as the complexity of the issues presented, the court's decision-making was delayed. See Born v. Progrexion Teleservices, Inc., No. 2:20-CV-107, 2020 WL 5803320, at *3 (D. Utah Sept. 29, 2020) (observing "high bar" for equitable tolling but that "equitable tolling [can be] appropriate based on a delay in th[e] Court's decision-making process, occasioned by its busy docket" (cleaned up)). The prospective plaintiffs in this action should not be prejudiced due to

the delay. Accordingly, the court equitably tolls the statute of limitations from February 9, 2024 (the date the Plaintiff filed his first motion for conditional certification), until the date of this order.

## VI. Motion for Conditional Certification of Collective Action

The Tenth Circuit has approved a two-step approach to determine whether proposed class members are "similarly situated" such that it would be appropriate for the court to permit an FLSA claim to proceed as a collective action. Thiessen v. Gen. Elec. Cap. Corp., 267 F.3d 1095, 1102–03, 1105 (10th Cir. 2001) (quoting 29 U.S.C. § 216(b)). First, the court "makes an initial 'notice stage' determination of whether plaintiffs are 'similarly situated.'" Id. at 1102 (citation omitted). "In doing so, a court 'require[s] nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy or plan.'" Id. (citation omitted). After the close of discovery, "the court then makes a second determination, utilizing a stricter standard of 'similarly situated.'" Id. at 1102–03 (citation omitted).

Here, the Plaintiff alleges that at least 35 other FSTs were similarly misclassified as independent contractors and denied overtime wages and that these FSTs are therefore similarly situated. (Compl. ¶ 43.) The Defendant did not respond to this contention but instead objected to conditional certification for the same reasons the Defendant moved to strike the Plaintiff's collective action request. Because the court is unpersuaded by these arguments for the reasons discussed above, the court finds that the Plaintiff has satisfied the first step required for collective action certification and should be allowed to proceed.

The Defendant has not otherwise objected to the description of the proposed collective or the form of the proposed notice attached to the Plaintiff's motion for conditional certification. Having reviewed that proposed notice (ECF No. 49-4), the court approves it. The court orders

the Defendant to provide the Plaintiff with a list of its current and former employees that fit within the class description within 21 days of the date of this order.

**ORDER**

For the foregoing reasons, the court ORDERS as follows:

1. The Defendant's Motion to Dismiss, Strike, or for Partial Summary Judgment (ECF No. 50) is DENIED.

2. The Plaintiff's Motion for a Conditional Certification of FLSA Collective Action (ECF No. 49) is GRANTED.

3. The Plaintiff's Motions for Status Hearing (ECF Nos. 74 and 77) are DENIED as moot.

4. The court finds that this order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation.

5. The court declines to stay this action while any interlocutory appeal is pending.

6. The court approves the proposed notice and class description.

7. The Defendant is ordered to provide the Plaintiff with a list of its current and former employees that fit within the class description within 21 days of the date of this order.

DATED this 20th day of November, 2026.

BY THE COURT:

Tena Campbell

Tena Campbell
United States District Judge